IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK   **JUDGE SULLIVAN**

|  |  |
|---|---|
| MINIFRAME LTD,<br><br>     Plaintiff<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>     Defendant. | Civil Action No.<br>(Antitrust) **11 CIV 7419**<br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff MiniFrame Ltd. ("MiniFrame"), by its attorneys, Kramer Levin Naftalis

& Frankel LLP, for its Complaint against Microsoft Corporation ("Microsoft"), alleges as

follows:

**I.      NATURE OF THIS ACTION**

1.      This is an action brought pursuant to Section 2 of the Sherman Act (15

U.S.C. § 2) to restrain anticompetitive conduct by Microsoft and remedy the effects thereof.

2.      This is an action brought pursuant to the Donnelly Act, N.Y. Gen. Bus.

Law § 340 and unfair competition common law to restrain anticompetitive conduct by Microsoft

and remedy the effects of its unlawful conduct.

3.      This is an action brought pursuant to the Revised Code of Washington,

RCW 19.86.020 and 19.86.040, as well as unfair competition common law, to restrain

anticompetitive conduct and unfair competition conduct by Microsoft and remedy the effects of

its unlawful conduct.

RECEIVED OCT 19 2011 U.S.D.C. S.D. N.Y. CASHIERS

4.      This is an action brought to restrain the tortious interference of MiniFrame's business relations by Microsoft and remedy the effects of its unlawful conduct.

## II.    THE PARTIES

5.      Plaintiff MiniFrame is a corporation organized and existing under the laws of Israel with its principal place of business located at 43 Hamelacha Street, 42504 Netanya, Israel.

6.      Defendant Microsoft is a corporation organized and existing under the laws of the State of Washington, with its principal place of business located at One Microsoft Way, Redmond, Washington.

## III.   JURISDICTION, VENUE AND COMMERCE

7.      This Court has jurisdiction over this matter pursuant to Section 4 of the Sherman Act (15 U.S.C. § 4), Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) and 28 U.S.C. §§ 1331 and 1337.

8.      The facts underlying the claims for relief under Donnelly Act, N.Y. Gen. Bus. Law § 340 and unfair competition common law share a common nucleus with the federal antitrust claims, and this Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

9.      The facts underlying the claims for relief under Revised Code of Washington, RCW 19.86.020 and 19.86.040 and unfair competition common law share a common nucleus with the federal antitrust claims, and this Court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

10.     This Court also has jurisdiction over the tortious interference state law cause of action under 28 U.S.C. § 1332(a)(2).

11.　Venue is proper in this District under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) and under 28 U.S.C. § 1391(b) and (c).

12.　The venue and personal jurisdiction of this Court over defendant Microsoft is proper because Microsoft transacts business within this District. More specifically, Microsoft has engaged in continuous and systematic activities within the State of New York by *inter alia*, placing software products into the stream of commerce, including the stream directed at the State of New York, with the knowledge and/or understanding that such products would be sold in the State of New York, including this district.

13.　Microsoft sells and/or licenses Windows operating systems throughout the United States and the world and delivers copies of its operating systems to OEMs and retail customers across state lines and international borders, including in this District. Microsoft is engaged in, and its activities substantially affect, interstate and foreign commerce, including the commerce in this District.

## IV.　BACKGROUND

### A.　TERMS

14.　A "computer" is a laptop, desktop or rack-mounted digital information processing device that includes a central processing unit ("CPU") and mass data storage.

15.　A "personal computer" ("PC") is a computer that is intended for use by individual users.

16.　A "server" is a computer that links PCs together and provides services to the PCs.

17.　An "operating system" ("OS") is a software program that controls the allocation and use of computer resources (such as central processing unit time, main memory space, disk space, input/output channels, etc.). Microsoft Windows is a specific type of

- 3 -

operating system that is owned by Microsoft. Other types of operating systems include Linux and Unix. No other product duplicates or fully substitutes for the Microsoft Windows operating system.

18. A "client operating system" is an operating system that is designed to run locally on a PC.

19. A "Windows Client Operating System" is a Windows-based client operating system that is designed to run locally on a PC.

20. A "server operating system" is an operating system that is designed to run on a server to provide services to the connected PCs.

21. A "Windows Server Operating System" is a Windows-based server operating system that is designed to run on a server.

22. A "shared PC system" is a multi-user computer system configuration which only uses a single operating system on a single PC.

23. "PC sharing software" is software which permits a shared PC system to be created. PC sharing software may include an operating system that permits multiple users to access and use a single operating system on a single PC.

24. A "multi-user computer system" is a computer system configuration in which multiple users access or share one or more operating system(s) running on a single PC or Server. A shared PC system is a type of multi-user computer system. A configuration in which multiple users access a single server operating system on a server from multiple desktop PCs is also a type of multi-user computer system.

25. "Multi-user software" is software that permits a multi-user computer system to be created. PC sharing software is a type of multi-user software. A server operating

- 4 -

system may be considered to be another type of multi-user software even though it provides services to connected PCs.

### B.    MICROSOFT WINDOWS CLIENT OPERATING SYSTEMS

26.    Microsoft sells, distributes and licenses various Windows Client Operating Systems that are designed to run on PCs. These have included, for example, Windows 95, Windows 98, Windows ME, Windows 2000, Windows XP, Windows Vista. Microsoft currently sells a variety of different versions of Windows 7 (and also sells downgrades to enable users to go back to Windows XP on machines that are bought with Windows 7).

### C.    MICROSOFT WINDOWS SERVER OPERATING SYSTEMS

27.    Microsoft distributes and licenses various Windows Server Operating Systems that are designed to run on servers. These include Windows Server 2003, Windows Server 2008 R2, Windows HPC Server 2008, Windows Small Business Server, Windows Essential Business Server, and Windows Home Server 2011.

### D.    THE RELEVANT MARKETS

28.    There are three relevant markets that Microsoft seeks to maintain its monopoly in or otherwise create a monopoly in:

> (a)    The server operating system market – this is a market for server operating systems;
>
> (b)    The PC sharing software market – this is a market for software that permits a shared PC system to be created; and
>
> (c)    The multi-user software market – this is a market for software that permits a multi-user computer system to be created.

29.    Microsoft seeks to maintain its monopoly in the server operating system market and the multi-user software market.

30.    Microsoft attempts to monopolize the PC sharing software market and the multi-user software market.

## V.    SHARED PC SYSTEMS THREATEN MICROSOFT'S POSITION IN THE RELEVANT MARKETS

31.    A PC or server can not perform any useful tasks without an operating system. As such, there is no commercially viable substitute for an operating system, whether it be a client operating system for PCs or a server operating system for servers.

### A.    MICROSOFT'S MONOPOLY

32.    Microsoft has a monopoly in the total market for operating systems, which includes server operating systems and client operating systems. According to Gartner, Inc., in 2010, Microsoft was the runaway leader in the operating system market with a 78.6 % market share based on revenues. The geographic market for operating systems is worldwide.

33.    Microsoft has a monopoly in the server operating system market. According to the International Data Corp ("IDC"), in the 4th quarter of 2009, Microsoft's Windows Server Operating Systems was the No. 1 server operating system in the world, both in terms of units and revenue. In terms of units, Microsoft's Windows Server Operating Systems accounted for 73.9% of all server operating system sales, followed by Linux at 21.2% and Unix at 4.3%. In terms of revenue, Microsoft's Windows Server Operating System accounted for 41.6% of the server operating system revenues, followed by Unix at 29.9% and Linux at 14.7%. In the 4th quarter of 2010, Microsoft's Windows Server Operating System's market share by revenue increased to 42.1%, followed by Unix at 25.6% and Linux at 17%. The geographic market for server operating system is worldwide.

34.    Microsoft also has a monopoly in the client operating system market. Although there is little published information on the client operating systems in PCs, Microsoft's

own research in February 2009 showed Microsoft was the runaway leader in client operating

systems, with over a 75% market share in home and business PCs. A Forrestor Research study

in July 2010 for desktop operating systems in North American and Europe companies found that

92% of them used a Windows Client Operating System. Network World reported that the

Windows market share in 2010 for desktop operating systems was over 90%. More than 80% of

new Intel-based PCs are shipped with a version of Windows pre-installed. PC manufacturers

(also known as Original Equipment Manufacturers or "OEMs") have no commercially

reasonable alternative to Microsoft's Windows Client Operating Systems for the PCs that they

distribute, in part because many customers want to use Windows applications which only work

with a Windows based operating system. The geographic market for client operating system is

worldwide.

### B.    THE RISE OF SHARED PC SYSTEMS

35.    Traditionally, a computer configuration involving a client operating

system on a single PC would be accessed by a single user at a time. Therefore, a customer

seeking to install a multi-user computer system would traditionally install a computer

configuration in which multiple PCs access a single server operating system that is located on a

single server. For example, a multi-user computer system can be created using a server running

a Windows Server Operating System (*e.g.*, Windows Server 2008) connected to individual PCs

that use Windows Client Operating Systems (*e.g.*, Windows 7).

36.    Before PC sharing software was developed in 2003 or 2004, there was no

cost effective multi-user computer system alternative to a server operating system configuration.

37.    Prior to 2007, Microsoft did not include any kind of restriction in its

licenses that would prevent multiple users from simultaneously sharing a single Windows Client

Operating System.

- 7 -

38.     Accordingly, companies were free to develop and sell PC sharing software that permitted multiple users to simultaneously access or share a single Windows Client Operating System without anyone violating the relevant Microsoft license.

39.     The eventual development of PC sharing software has enabled the creation of multi-user configurations of a Windows Client Operating System. In other words, a multi-user configuration of a Windows Client Operating System is a type of shared PC system and typically requires some form of PC sharing software.

40.     In 2003, MiniFrame was established. MiniFrame's core technology was focused on software solutions for shared PC systems. MiniFrame developed the SoftXpand line of PC sharing software, which permitted multiple users to simultaneously access and use a single Windows Client Operating System on a single PC from ordinary peripherals such as a monitor, keyboard and mouse. No separate computers or thin client devices are needed or used to access the Windows Client Operating System running on the single PC. Thus, any customers using MiniFrame's SoftXpand to create a shared PC system were in compliance with Microsoft's End User License Agreement ("EULA") because no other computers were used to access the single desktop PC running the Windows Client Operating System. MiniFrame's SoftXpand technology became well accepted and was used in over 30 countries.

41.     On information and belief, in 2004, a company known as NComputing was founded. NComputing developed proprietary hardware and vSpace Desktop Virtualization Software ("NComputing Products") which transformed a single PC running a Windows Client Operating System into a multi-user computer system. That is, with NComputing Products, customers could also create a shared PC system from a single PC running a single Windows Client Operating System which multiple users access via regular peripherals such as a monitor,

- 8 -

keyboard and mouse. Because no other computers were used to access the single desktop PC

running the Windows Client Operating System, any customers using NComputing Products were

in compliance with Microsoft's EULA as well. NComputing Products became widely used in

numerous countries worldwide.

42.     On information and belief, NComputing and Microsoft entered into an

agreement in 2009 that permits NComputing to offer multi-user computing solutions with

Microsoft's endorsement and approval. These solutions, however, appear to require the user to

also utilize a Microsoft server product. (*See, e.g.,*

http://www.microsoft.com/presspass/press/2009/nov09/11-25msncomputingpr.mspx and

http://www.ncomputing.com/WindowsMultiUserLicensing).

43.     Another software company known as Thinsoft (Holdings), Inc.

("Thinsoft") developed various software product series, known as WinConnect, Betwin, Buddy

and WinConnect Server, that enable multiple users to simultaneously share the same Windows

Client Operating System running on a single PC with multiple monitors, keyboards and mice.

44.     While a server operating system uses a server to host the multi-user

system, a shared PC system uses a single PC. Additionally, multiple users in the server

configuration access the server operating system using multiple desktop PCs, each of which is

connected to various peripheral devices (*e.g.*, monitor, keyboard, mouse). On the other hand,

multiple users of a shared PC system can access the single PC using just the peripheral devices

(*e.g.*, monitor, keyboard, mouse) without individual desktop PCs. As a result, shared PC systems

require less hardware, energy and maintenance, and therefore cost significantly less, both in

capital expenditure and in operating costs, than a configuration based on a server operating

system.

- 9 -

45.     A shared PC system also requires significantly less software than a configuration based on a server operating system. A Windows Server Operating System configuration needs Windows Server Operating System software (*e.g.*, Windows Server 2008 R2) for the server and Windows Client Operating System software (*e.g.*, Windows 7) for each PC or thin client device. On the other hand, a shared PC system only needs Windows Client Operating System software (*e.g.*, Windows 7) for a single PC and PC sharing software (*e.g.*, MiniFrame's SoftXpand).

46.     Prior to Microsoft's anticompetitive conduct detailed elsewhere in this Complaint, a shared PC system was significantly less expensive in terms of the licenses required by Microsoft than a Windows Server Operating System configuration. A Windows Server Operating System configuration required a license to a Windows Server Operating System (*e.g.*, Windows Server 2008 R2), a license for each Windows Client Operating System (*e.g.*, Windows 7) on each PC, and a Client Access License ("CAL") for each PC that accessed the server operating system. On the other hand, a shared PC system only needed a single license for the Windows Client Operating System (*e.g.*, Windows XP).

47.     The following chart helps to better illustrate the differences that existed

between a shared PC system and a Windows Server Operating System configuration:

| Type Of Multi-User Configuration | Shared Operating System Hardware | Multiple User Remote Access Hardware | Software Required | Microsoft Licenses Required |
|---|---|---|---|---|
| Windows Server Operating System | Server | PC, Monitor, Keyboard, Mouse | 1) Windows Server Operating System software 2) Windows Client Operating System software for each PC | 1) Windows Server Operating System license 2) Client Access License for each PC 3) Windows Client Operating System license for each PC |
| Shared PC System | PC | Monitor, Keyboard, Mouse | 1) Windows Client Operating System software 2) PC sharing software | 1) Windows Client Operating System license |

48.    Thus, a shared PC system was more affordable to customers looking to purchase and install a multi-user computer system than a server operating system configuration. For example, in order to install a multi-user computer system, a customer no longer needed to purchase the more expensive hardware, software, and license for a server in addition to the hardware, software and licenses for multiple PCs, as is required for a traditional server operating system configuration. As a result, shared PC systems became a serious competitive threat to the server operating system market as well as Microsoft's monopoly (e.g., based on the Windows Server Operating System) in the server operating system market.[1]

## VI.    MICROSOFT'S CONDUCT IN RESPONSE TO THE RISE IN SHARED PC SYSTEMS IS ANTICOMPETITIVE

49.    Upon information and belief, Microsoft recognized the competitive threat that shared PC systems posed and engaged in several anticompetitive strategies in order to ensure

---

[1]    Microsoft is also attempting to further maintain its monopoly in the client operating system market because each virtual, non-server base station is a potential lost client license in Microsoft's view.

it will maintain or otherwise have a monopoly for any multi-user market, whether it be the server operating system market, the PC sharing software market, or the combination of the two markets.

### A. MICROSOFT'S SINGLE USER LICENSE RESTRICTION IN ITS WINDOWS CLIENT OPERATING SYSTEM IS ANTICOMPETITIVE

50.     Microsoft includes an EULA with each copy of a Windows Client Operating System sold (or requires its OEM builders to include the EULA with each new system sold). The EULA provides the terms and restrictions with which the purchaser of that operating system or PC must comply. Microsoft provides a different EULA for each Windows Client Operating System, and Microsoft's EULAs have been modified many times over the years.

51.     Microsoft also publishes Product Use Rights ("PUR") that apply to at least companies that utilize Microsoft's volume licensing provisions. The PUR defines 9 different licensing models to cover the various groups of products Microsoft sells. (*See* http://download.microsoft.com/ download/E/8/E/E8EDAE36-CBC6-4123-BC5A-F651D174FD6C/PUR_Explained.docx).

52.     Microsoft has sole control over the terms and restrictions set forth in the EULAs (and PUR) and, according to Microsoft, users must accept the license terms as offered or return the merchandise they purchased (*e.g.*, a new computer with Windows 7 pre-installed, a new copy of a Windows 7, etc.).

53.     None of the EULAs for Microsoft's pre-2000 Windows Client Operating Systems (*e.g.*, Windows 95, Windows 98, Windows 2000, Windows ME) included any restriction that only a single user could access or use the Windows Client Operating System at the same time (a "Single User Restriction"). Rather, these EULAs prohibited customers from sharing or using the Windows Client Operating System concurrently on multiple computers. By

way of example, the EULA for Windows 2000 and Windows 98 both stated:

> Storage/Network use. The SOFTWARE PRODUCT may not be installed, accessed, displayed, run, shared or used concurrently on or from different computers, including a workstation, terminal or other digital electronic device ("Devices"). Notwithstanding the foregoing and except as otherwise provided below, any number of Devices, may access or otherwise utilize the file and print services and internet information services of the SOFTWARE PRODUCT, if included.

54. The EULA for Windows XP, which was Microsoft's flagship Windows

Client Operating System product from 2001 to 2007, also did not have any Single User

Restriction. Rather, the EULA for Windows XP only prohibited customers from sharing or

using this operating system on multiple "Workstation Computers." In other words, the Windows

XP EULA only prohibited multiple computers (not multiple users) from using the Windows

Client Operating System. Microsoft's Windows XP Professional EULA stated:

> **Installation and use.** You may install, use, access, display and run one copy of the Product on a single computer, such as a workstation, terminal or other device ("Workstation Computer"). The Product may not be used by more than two (2) processors at any one time on any single Workstation Computer. You may permit a maximum of ten (10) computers or other electronic devices (each a "Device") to connect to the Workstation Computer to utilize the services of the Product solely for File and Print services, Internet Information Services, and remote access (including connection sharing and telephony services). The ten connection maximum includes any indirect connections made through "multiplexing" or other software or hardware which pools or aggregates connections. Except as otherwise permitted by the NetMeeting, Remote Assistance, and Remote Desktop features described below, you may not use the Product to permit any Device to use, access, display or run other executable software residing on the Workstation Computer, nor may you permit any Device to use, access, display, or run the Product or Product's user interface, unless the Device has a separate license for the Product.

> **Storage/Network Use.** You may also store or install a copy of the Product on storage device, such as a network server, used only to install or run the Product on your other Workstation Computers over an internal network; however, you must acquire and dedicate an additional license for each separate Workstation Computer on or from which the Product is

- 13 -

> installed, used, accessed, displayed or run. *A license for the Product may not be shared or used on different Workstation Computers.*

(**bold** and *italics* in original; <u>underline</u> added).

55.     Microsoft's Window XP Home Edition EULA includes almost no

restrictions on use:

> Installation and use. You may install, use, access, display and run one copy of the Software on <u>a single computer</u>, such as a workstation, terminal or other device ("Workstation Computer"). The Software may not be used by more than one processor at any one time on any single Workstation Computer.
>
> Storage/Network Use. You may also store or install a copy of the Software on a storage device, such as a network server, used only to install or run the Software on your other Workstation Computers over an internal network; however, <u>you must acquire and dedicate an additional license for each separate Workstation Computer</u> on or from which the Software is installed, used, accessed, displayed or run. Except as otherwise permitted by the NetMeeting and Remote Assistance features described above, a license for the Software may not be shared or used concurrently on different Workstation Computers.

(<u>underline</u> added).

56.     Thus, multiple users could access and use the Windows XP Client

Operating System and any of the other previous Windows Client Operating System as long as

they did not access or use that Windows Client Operating System from another <u>computer</u>.

57.     In 2004, Microsoft released Windows XP Service Pack 2. The EULA for

Windows XP Service Pack 2 provides equivalent restrictions in a slightly different presentation.

58.     In 2007, Microsoft released Windows Vista as the successor to Windows

XP. The Windows Vista EULA included a Single User Restriction that stated:

> **2.b. Number of Users.** Except as provided in the Device Connections (all editions), Remote Access Technologies (Home Basic and Home Premium editions) and other Access Technologies (Ultimate edition) sections below, only one user may use the software at a time.

- 14 -

59.     The Windows Vista EULA was the very first time that the EULA for a

Windows Client Operating System contained any type of Single User Restriction.

60.     Upon information and belief, the Windows Vista EULA included the

Single User Restriction to prevent customers from using Windows Vista (a Windows Client

Operating System) in a shared PC system.

61.     Subsequently, Microsoft released Windows 7 in 2009 to replace both

Windows XP and Windows Vista. The EULA for Windows 7 also contained a Single User

Restriction, which states:

> **2.c. Number of Users.** Unless otherwise provided in these license terms,
> only one user may use the software at a time.

62.     After Microsoft became aware of the competitive threat posed by cheaper

shared PC systems, any new EULA for a Windows Client Operating Systems included a Single

User Restriction.

63.     After Microsoft became aware of the competitive threat posed by cheaper

shared PC systems, any modification of an existing EULA for a Windows Client Operating

Systems included the addition of a Single User Restriction.

64.     Based on these Single User Restrictions, Microsoft does not allow

customers to install PC sharing software to create a shared PC system.

65.     Based on these Single User Restrictions, customers have no choice but to

purchase a Windows Server Operating System if they want to install a multi-user computer

system. In fact, as early as March 2008, Microsoft issued a brief on volume licensing that states:

> Windows client operating systems license terms do not permit multiple
> users to access or otherwise use one licensed copy of the software
> simultaneously.
> ...
> While the Windows client operating system does not permit licensing a
> multiuser solution, the Windows Server operating systems provide a

- 15 -

multiuser solution using Remote Desktop Services and/or other technologies.

66.    These Single User Restrictions have no technological basis for any Windows Client Operating System. That is, there is no technological reason why multiple users cannot access or use the same Windows Client Operating System at the same time (*i.e.*, there is no technological reason why PC sharing software cannot be used with a Windows Client Operating System to create a shared PC system).

67.    From a technological standpoint, multiple users can simultaneously access or use the same Windows Client Operating System on the same PC.

68.    In fact, Microsoft's Windows Client Operating Systems (*e.g.*, Windows XP, Windows Vista, Windows 7) all contain features and inherent characteristics that permit and enable multiple users to use the same Windows Client Operating System on a single PC simultaneously. For example, one user can be downloading a video from YouTube in the background while another user can login and simultaneously check his or her Yahoo email account while the video continues to download. The capability for multiple users to be executing tasks simultaneously on a single PC has existed in various versions of Microsoft's Windows Operating Systems for some time, such as through the use of the "Run As" command from the START button.

69.    Microsoft has not provided any technological explanation or justification for a Single User Restriction.

70.    Microsoft has not provided any technological explanation why multiple users cannot access or use the same Windows Client Operating System at the same time.

71.     Microsoft has not provided any technological explanation of why PC sharing software cannot be used with a Windows Client Operating System to create a shared PC system.

72.     In fact, shared PC systems using a Windows Client Operating System have been successfully created with PC sharing software such as NComputing Products, Thinsoft's Betwin software, and MiniFrame's SoftXpand software (as well as others). In addition, Microsoft itself offers several products that provide multi-user capability under a single Windows Client Operating System license, such as Microsoft's MultiPoint Mouse and Media Center.

73.     Microsoft has even filed for trademark protection of the mark "MULTIPOINT" to describe computer software development tools for enabling multiple users to use a single computer.

74.     Thus, Microsoft's position is simply that Microsoft's <u>license restrictions</u> (versus any technology or software limitation) only permit simultaneous use by multiple users with a Windows Server Operating System and not with a Windows Client Operating System, unless Microsoft itself wants to distribute a multi-user product.

75.     As such, Microsoft intentionally restrains competition from challenging the server operating system market and its monopoly therein by only offering Windows Client Operating Systems under EULAs that prohibit customers from creating shared PC systems and instead forces customers to purchase a Windows Server Operating System. In other words, the Single User Restrictions in Microsoft's EULAs are or have created an unlawful barrier to entry for any competition to develop against the server operating systems market. Microsoft's conduct is therefore anti-competitive.

76.     Windows Server Operating System configurations generate more revenue and are more profitable for Microsoft than shared PC systems.

77.     A customer installing a multi-user configuration using a Windows Server Operating System must spend more money on software, licenses (*e.g.,* Client Access Licenses, Server Licenses) and hardware (because servers typically need more processing power and storage than a typical PC), than a customer installing PC sharing software with a Windows Client Operating System to create a shared PC system.

## B.     MICROSOFT'S INTERFERENCE WITH MINIFRAME'S POTENTIAL PARTNERS AND CUSTOMERS IS ANTICOMPETITIVE

78.     Prior to Microsoft issuing its Single User Restriction, MiniFrame's customers and partners were free to use its SoftXpand software to create a shared PC system. MiniFrame's SoftXpand product line generated interest in numerous countries around the world, including the United States.

79.     While MiniFrame's customers and partners were technically free to use SoftXpand on any PC, Microsoft never officially approved the use of SoftXpand with any Windows Client Operating System, and many of these very same customers and partners were reluctant and/or afraid of utilizing SoftXpand without Microsoft's approval.

80.     Microsoft has a monopoly in the client operating system market and has sole control over the terms and restrictions set forth in the EULAs (and PUR).

81.     There are a few other options for client operating systems, such as Linux, Android & Mac OS X, but such alternatives are simply impractical, largely because most customers require compatibility with Windows application software, such as Microsoft's Office software. It would be economically infeasible, if not impossible, for a competitor such as

MiniFrame to design a new client operating system that would be compatible with Windows application software.

82.     Because Microsoft has a monopoly in the client operating system market, an unlawful term or restriction in Microsoft's EULAs would create a substantial and unlawful barrier to entry into any market based on the Windows operating system platform.

83.     It would be feasible for Microsoft to provide access to and licensing for the Windows operating system platform to competitors in the relevant markets on commercially reasonable and non-discriminatory terms.

84.     However, because Microsoft has a monopoly in the client operating system market, Microsoft has been able to add new terms in its license after the fact, such as the Single User Restriction, to scare and/or otherwise force MiniFrame's potential partners and customers into abandoning projects that were going to use MiniFrame's SoftXpand to create shared PC systems, thereby restraining competition in the PC sharing software market.

85.     With the advent of Microsoft's Single User Restriction, the fear of and/or concern about Microsoft grew as MiniFrame's potential partners and customers became worried about the conflict this restriction created between Microsoft's EULAs and the freedom to access and use a single Windows Client Operating System in a shared PC system. Consequently, many of MiniFrame's potential partners and customers contacted Microsoft seeking Microsoft's approval on the use of SoftXpand to create a shared PC system.

86.     From the outset, Microsoft gave confusing responses to these inquiries. For some customers, Microsoft took the position that the customer need only purchase a Windows Client Operating System license for each user (for example, this occurred with respect to a customer in Portugal). For others, Microsoft indicated that the use of SoftXpand was

acceptable without any other licenses (for example, this occurred in Hungary). In many instances, and mainly after MultiPoint Server was released, Microsoft simply repeated the same position that was set forth in Microsoft's Volume Licensing Brief, namely that multi-user configurations were only permitted with a Windows Server Operating System. The initial confusion created by Microsoft's inconsistent positions significantly impacted MiniFrame's ability to successfully market SoftXpand.

87.     Driven by this disturbing loss in potential partners and customers, MiniFrame's CEO, Eli Segal, sent a letter dated February 3, 2009 to Microsoft's CEO, Steve Ballmer, informing Microsoft "how damaging Microsoft's offices' inconsistency is for [MiniFrame's] innovative products." Recognizing that Microsoft did not have a product on the market that can offer customers a low cost shared PC system, MiniFrame also offered to discuss a collaboration between MiniFrame and Microsoft with respect to PC sharing software.

88.     Microsoft never responded to Mr. Segal's February 3, 2009 letter.

89.     However, Microsoft continued to threaten MiniFrame and its potential partners and customers, including OEMs.

90.     OEMs are potential partners that manufacture their own products, such as the hardware components of fully-assembled PCs, laptops, and peripherals (*e.g.*, companies such as Hewlett-Packard, Sony, Samsung, etc.). However, because of Microsoft's requirements on its OEM builders, and the fact that a PC cannot function without an operating system, OEMs in the business of manufacturing and distributing PCs are often required to pre-install client operating systems onto the PC so that it can be sold as a fully functional machine right out of the box. As previously explained, Microsoft dominates the client operating system market with its Windows Client Operating System software. Accordingly, Microsoft possesses significant market power

- 20 -

through its client operating system monopoly to influence OEMs' business decisions, including any projects related to shared PC systems and multi-user computer systems (moreover, the potential withdrawal by Microsoft of the OEM System Builder License is a major financial incentive to such companies to follow whatever guidance Microsoft suggests).

91.     Moreover, the OEMs cannot operate as OEMs without Microsoft's OEM System Builder License that permits (and in fact often requires) the OEMs to pre-install Windows Client Operating Systems in their products. These OEM System Builder Licenses are crucial to OEMs – without such a license, an OEM cannot pre-install Windows Client Operating Systems onto their products, which makes them much harder to sell. Because of Microsoft's monopoly on client operating systems and the corresponding demand for Windows Client Operating Systems, an OEM would be severely disadvantaged if Microsoft were to refuse it a future OEM System Builder License to pre-install Windows Client Operating Systems or to reduce the technical support Microsoft provides its OEMs.

(a)     **HEWLETT-PACKARD**

92.     Hewlett-Packard Company ("HP") is an OEM engaged in the business of, *inter alia*, manufacturing and distributing HP brand computing products, including PCs.

93.     Sometime in early or prior to 2009, HP was interested in entering the PC sharing market and consequently was looking for a provider of PC sharing software that HP could partner with. After some investigation, HP decided to evaluate MiniFrame's SoftXpand software and approached MiniFrame to discuss a possible collaboration.

94.     On March 19, 2009, HP and MiniFrame engaged in a conference call to discuss a joint cooperation in the "PC sharing market." HP indicated they were looking to create a joint PC sharing solution and were thinking of basing it on SoftXpand and Windows XP in the

- 21 -

education market. HP wanted to compete in the PC sharing market by selling a multi-user configuration based on Windows XP (a Windows Client Operating System).

95.    Sometime shortly thereafter, HP conducted a series of tests on the SoftXpand multi-user solution for Windows XP using HP docking stations. HP shipped docking stations to Israel and MiniFrame conducted tests, as well.

96.    On May 14, 2009, HP and MiniFrame engaged in another conference call to further discuss their joint collaboration and business relationship. MiniFrame confirmed that the testing of HP docks were successful. HP stated that HP planned to launch a joint PC sharing solution incorporating SoftXpand in November 2009 ("HP-MiniFrame PC sharing solution"). HP also stated that it had expected to sell over 3 million units of this joint PC sharing solution in 3 years.

97.    On May 20, 2009, HP and MiniFrame engaged in additional conference calls regarding their joint collaboration for a joint PC sharing solution. HP reaffirmed its projection of over 3 million units of the HP-MiniFrame PC sharing solution.

98.    On June 8, 2009, HP sent MiniFrame a first draft of an agreement to further formalize the relationship between the companies, the MiniFrame-HP Software License and Distribution Agreement ("SLA").

99.    On June 9, 2009, DisplayLink and MiniFrame engaged in a conference call related to MiniFrame's project with HP. DisplayLink manufactures various components that were intended to be used in the HP-MiniFrame PC sharing solution, including video cards, USB video adaptors, etc. A Mutual Non-Disclosure Agreement between DisplayLink and MiniFrame was prepared. MiniFrame signed this agreement, DisplayLink did not.

100. In addition, a Three Way Multi-Party Disclosure Consent Agreement was prepared to permit HP, DisplayLink and MiniFrame to discuss and share confidential information for a "PC Shared Resource Computing Product" that was going to incorporate products from MiniFrame and DisplayLink. MiniFrame signed this agreement on June 29, 2009.

101. On July 21, 2009, MiniFrame notified HP that it will provide comments to the SLA terms "next week."

102. Just two days later on July 23, 2009, HP abruptly informed MiniFrame that it had "decided to cancel the project at this time for a number of reasons."

103. In 2010, HP's net revenue increased 10%, of which nearly all was attributed to the Personal Systems Group, which includes PCs and related products.

104. Upon information and belief, HP holds a System Builder License from Microsoft that permits HP to pre-install Windows Client Operating Systems in the PCs it sells.

105. Upon information and belief, HP's decision to terminate the HP-MiniFrame PC Sharing solution was due to pressure and/or other influence from Microsoft.

106. At the time HP terminated the project with MiniFrame, Microsoft did not have a commercially available multi-user product for sale.

107. Subsequent to the termination of discussions with MiniFrame, HP launched the "HP MultiSeat Computing Solution," a multi-user configuration that shares a single operating system on a single PC (*i.e.*, a shared PC system). Instead of using MiniFrame's SoftXpand software, the HP MultiSeat Computing Solution used a brand new product from Microsoft called Windows MultiPoint Server that has functionality similar to that of MiniFrame's SoftXpand product.

108.     On information and belief, Microsoft copied the functionality and underlying technology of MiniFrame's SoftXpand product, or otherwise obtained such functionality and underlying technology, to create the Windows MultiPoint Server.

109.     On information and belief, Microsoft granted HP an exclusive license to produce and distribute hardware incorporating Windows MultiPoint Server.

110.     Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $200 million dollars from this project alone.

111.     Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

112.     Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

## C.     THE TERMS ON WHICH MICROSOFT OFFERS ITS MULTIPOINT SERVER PRODUCT ARE ANTICOMPETITIVE

113.     Recognizing an opportunity to dominate a new market for PC sharing software, Microsoft also intended and attempted to create a monopoly in this new PC sharing software market through a new product called Windows MultiPoint Server ("MPS"). Microsoft used its anticompetitive license restrictions, along with predatory pricing tactics, to ensure that customers who want to create a shared PC system have no choice but to purchase Microsoft's new MPS product.

114.     Similarly, Microsoft also intended and attempted to engage in anticompetitive conduct to maintain its monopoly in the multi-user software market through its MPS product. Alternatively, Microsoft intended and attempted to engage in anticompetitive

- 24 -

conduct to dominate and create a monopoly in the multi-user software market through the MPS product.

115.    Microsoft has a dangerous probability of success in monopolizing the PC sharing software market, as well as the multi-user software market.

116.    Launched in 2010, MPS appears to be an application that is bundled with some form of Microsoft's Windows Server 2008 R2 product. When installing MPS, one of the initial screens states that Windows Server 2008 R2 is being installed. Moreover, Windows operating system software is typically stored in the "Windows" folder, but MPS is stored in the "Programs" folder that is commonly used to hold application software. Also, Microsoft requires certain Windows Server 2008 R2 licenses in order to use MPS (*e.g.*, Microsoft requires each user to have an MPS client access license ("CAL") and a Windows Server 2008 CAL).

117.    A shared PC system can be created with MPS, or with a Windows Client Operating System that uses a third-party PC sharing software such as MiniFrame's SoftXpand product. Other third-party PC sharing software include NComputing's vSpace and Thinsoft's Betwin.

118.    Accordingly, Microsoft's MPS product is an application that runs on top of a version of Windows Server 2008 R2 operating system to give the host computer shared PC functionality.

119.    Because Microsoft's MPS is also software that creates a shared PC system, it qualifies as both PC sharing software and multi-user software that competes directly with MiniFrame's SoftXpand, NComputing Products, and Thinsoft's Betwin.

120.    As previously discussed in paragraphs 106 through 109, Hewlett-Packard launched its HP MultiSeat Computing Solution, which provides a shared PC system based on

MPS. The HP MultiSeat Computing Solution was the debut hardware platform for MPS and HP had an exclusive license to produce and distribute hardware incorporating MPS software.

121.    MPS has functionality similar to that of MiniFrame's SoftXpand product.

122.    On information and belief, Microsoft copied the functionality and underlying technology of MiniFrame's SoftXpand product, or otherwise obtained such functionality and underlying technology, to create MPS.

123.    After launching MPS in 2010, Microsoft amended its Volume Licensing Brief in February 2011 to include the permissible use of MPS:

> The Windows client operating system license terms do not permit multiple users to access or otherwise use one licensed copy of the software simultaneously. However, Windows Server operating systems and Windows MultiPoint Server are designed and licensed for multiuser scenarios and should be used for all Windows multiuser scenarios.

124.    Thus, once MPS was introduced, Microsoft changed its position so that Microsoft's license policy (not technology or software) continued to be the sole limiting factor on multi-user configurations. Microsoft's new position only permits multi-user configurations through the use of its own products, either a Windows Server Operating System or MPS. That position still prohibits using third-party PC sharing software with a Windows Client Operating System to create a multi-user system. Before MPS was introduced, the only "permitted" multi-user Windows environment was via a Windows Server Operating System. As such, Microsoft is forcing customers to purchase either a Windows Server Operating System or its new MPS product in order to obtain a multi-user configuration. Microsoft's conduct in this regard is both restraining competition from challenging the server operating systems market as well as maintaining its monopoly in the multi-user software market. Microsoft's conduct is also restraining competition from developing in the market for PC sharing software and multi-user software.

125.     Microsoft's Single User Restriction has created an unlawful barrier to entry for competition in the market for PC sharing software. This market includes NComputing Products, Thinsoft's Betwin software, and MiniFrame's SoftXpand software, and now Microsoft's MPS software.

126.     Additionally, Microsoft's Single User Restriction has also created an unlawful barrier to entry for competition in the multi-user software market. Competing third-party PC sharing companies like MiniFrame cannot compete with Microsoft because customers are forced to purchase either a Windows Server Operating System or MPS.

127.     Microsoft has not provided any technological explanation or justification for this arbitrary change to its licensing policy.

128.     Specifically, there are no technological limitations that would prohibit a Windows Client Operating System from being configured as a multi-user environment (*e.g.*, using PC sharing software with a Windows Client Operating System to create a shared PC system).

129.     In fact, shared PC systems using a Windows Client Operating System have been successfully created with PC sharing software such as NComputing's vSpace software, Thinsoft's Betwin software, and MiniFrame's SoftXpand software long before the MPS product was launched.

130.     Prior to the introduction of MPS, Microsoft engaged in unfair competition by forcing customers to buy unnecessary Microsoft licenses to use third-party PC sharing software. Microsoft prohibited customers from using third-party PC sharing software such as MiniFrame's SoftXpand with a Windows Client Operating System to create a shared PC system unless the customer also purchased from Microsoft a Windows Server 2008 R2 license at

- 27 -

approximately $1000 per server and Client Access Licenses at approximately $200 per user. From a technological standpoint, however, a customer need only to purchase a copy of MiniFrame's SoftXpand software and a copy of a Windows Client Operating System to create a shared PC system. Thus, the additional purchase of a license to Microsoft Windows Server 2008 R2 and the corresponding number of CALs is completely unnecessary to create a shared PC system.

131.    With the launch of its MPS product in 2010 to compete directly against third-party PC sharing software (and the related amendment to its licensing policy in February 2011), Microsoft engaged in predatory pricing as well. Microsoft now informs those same potential MiniFrame customers that they can have a multi-user configuration by only having to purchase a license to Microsoft's MPS at $133 per server (versus approximately $1,000) and Microsoft's CAL at $29 per user (versus approximately $200) to create a shared PC system.

132.    If there were lawful free market competition in the software and licenses needed to create a shared PC system, Microsoft's MPS product would have to compete directly with the combination of a Windows Client Operating System and third-party PC sharing software. Thus, the following lawful pricing scenario would have been the result of free market competition:

| Software Licenses Required For Shared PC System | Cost To Use MiniFrame's SoftXpand | Cost To Use Microsoft's MPS (Academic price) | Cost To Use Microsoft's MPS (Non-academic price) |
|---|---|---|---|
| Operating System | $120 Windows 7 License | $133 MPS License | $817 MPS License |
| Additional | $100 SoftXpand per user | $29 CAL per user (min. 5) | $139 CAL per user (min. 5) |

133. With this comparable pricing scenario, these two competing PC sharing software products could compete based on business acumen, merit and technological superiority.

134. However, because of Microsoft's anticompetitive conduct requiring MiniFrame's customers to also purchase a Windows Server 2008 R2 license and a CAL for each user at an unjustified pricing differential, Microsoft has restrained competition and forced those customers to face the following unlawful pricing scenario:

| Software Licenses Required For Shared PC System | Cost To Use MiniFrame's SoftXpand | Cost To Use Microsoft's MPS (Academic price) | Cost To Use Microsoft's MPS (Non-academic price) |
|---|---|---|---|
| Operating System | $120 Windows 7 License | $133 MPS License | $817 MPS License |
| Additional | $100 SoftXpand License per user $1,000 Windows Server 2008 R2 License $200 CALs per User | $29 CAL per User (min. 5) | $139 CAL per user (min. 5) |

135. Faced with over $1000 of artificial and additional licensing costs that have no technological basis or justification whatsoever in a shared PC system using MiniFrame's SoftXpand, a customer would practically have no choice but to purchase Microsoft's MPS product for any shared PC system instead.

136. Faced with over a 90% difference in price of the server license, a customer would again have no practical choice but to purchase Microsoft's MPS for any shared PC system. However, there is no technological or cost justification for this price differential. Upon information and belief, Microsoft's MPS product is sold as a bundle of an application running on the Windows Server 2008 R2 operating system to give it shared PC functionality. The users essentially do not know they are running a version of Windows Server 2008 R2, but they have to

- 29 -

pay Microsoft for a server CAL for each user. If it were priced fairly, MPS should actually be comparable in pricing to the Windows Server 2008 R2, if not slightly more expensive (since the user gets Windows Server 2008 R2 plus MPS). Thus, Microsoft's price differential in this situation is in reality a predatory pricing tactic used to drive out competition from third-party PC sharing software, such as MiniFrame's SoftXpand product. Microsoft's sole control and misuse of this pricing differential is or has created an unlawful barrier to entry for competition in the PC sharing software market as well as the multi-user software market. Once there is no other competition, Microsoft will be able to raise the prices of the CALS to the detriment of the customer.

137. As previously explained, MPS is an application running on Windows Server 2008 R2. Accordingly, the pricing of MPS server licenses and CALs in a competitive market would be comparable to or higher than the prices for Windows Server 2008 R2.

138. Moreover, there is no technology or software behind a CAL. A CAL is nothing more than a written permission to access the operating system. Thus, the price of a CAL for MPS should be comparable to the price of a CAL for Windows Server 2008 R2.

139. In fact, Microsoft has already succeeded on several occasions to ensure that it would dominate the PC sharing software market and the multi-user software market with its MPS product. As set forth in more detail in Section VII, *infra*, Microsoft forced original equipment manufacturers like Hewlett-Packard, as well as third-party software vendors like NComputing, to publically state that the only allowed multi-user configuration for Windows is a server-based system provided by Microsoft, such as Windows Server 2008 R2 or MPS.

140. Microsoft's attempt to create a new monopoly in the PC sharing software market against third-party software that works with Windows Client Operating Systems is due

purely to Microsoft's anticompetitive conduct and not due to any business acumen, merit or technological superiority of its MPS.

141. Microsoft's ability to maintain its monopoly or attempt to create a new monopoly in the multi-user software market against third-party software that works with Windows Client Operating Systems is due purely to Microsoft's anticompetitive conduct and not due to any business acumen, merit or technological superiority of its MPS.

**D. MICROSOFT'S RECENT INTERACTIONS WITH MINIFRAME AND ITS CONTINUED THREATS ARE ANTICOMPETITIVE**

142. On September 20, 2010, Microsoft's Windows Client General Manager, Gavriella Schuster, contacted MiniFrame's Vice President International Marketing and Sales, Emmanuel Boutboul, expressing Microsoft's concern that MiniFrame's "customers may use [SoftXpand] in a way that is not licensed by Microsoft and that [MiniFrame's] customers may mistakenly believe that this use is permitted by Microsoft."

143. At one point, it temporarily appeared that Microsoft and MiniFrame would enter into discussions to potentially resolve this dispute. Indeed, in November, 2010, Microsoft and MiniFrame signed a Non-Disclosure Agreement so that confidential discussions could take place between them. MiniFrame and Microsoft initially met on November 11, 2010.

144. MiniFrame was looking forward to further discussions to resolve the dispute and informed Microsoft on January 23, 2011 that a number of large consumer electronic companies have "assured [MiniFrame] that SoftXpand is the best Windows based technology and the only one that provides a true performance and native user experience. As a result many of these companies are interested in collaborating with MiniFrame towards including [MiniFrame's] technology in their offering."

145. However, these discussions failed to resolve the issues and Microsoft remained unwilling to alter its position at all on the use of MiniFrame's SoftXpand to create shared PC systems. Indeed, on May 13, 2011, Microsoft's Director of Product Management, Windows Server, Manilo Vecchiet, told one of MiniFrame's consultants, Gil Mor, that MiniFrame's SoftXpand technology is a "concern" for Microsoft. Mr. Vecchiet went on to state again that the only allowed configurations for multi-user computer systems are those that are based on one of Microsoft's Windows Server Operating Systems, such as an installation of MPS. Mr. Vecchiet further explained that Microsoft did not and would not allow any shared PC systems using Windows Client Operating Systems, even if customers complained that the server option was too expensive. Microsoft was very concerned about the competitive threat to its dominance in the market for server operating systems, PC sharing software and multi-user software by MiniFrame's SoftXpand line of products.

146. Microsoft wrongfully refuses to deal and cooperate with MiniFrame, and its partners and customers, on commercially reasonable and non-discriminatory terms, thereby unlawfully leveraging its monopoly power in the relevant markets.

147. As such, Microsoft has continued its anticompetitive conduct to restrain competition by forcing customers to purchase a Windows Server Operating System or MPS if they want a multi-user configuration of Windows.

### (a)   JP MORGAN CHASE

148. On or about July 13, 2011, JP Morgan Chase ("JP Morgan") contacted MiniFrame and inquired about MiniFrame's SoftXpand line of products. JP Morgan had tested SoftXpand and was interested in implementing SoftXpand in approximately 80,000 JP Morgan Chase computers that were running Windows XP.

149. On or about July 18, 2011, JP Morgan and Yovel Badash, representing MiniFrame in NY, had a conference call in which JP Morgan explained that they were planning on purchasing an extra 80,000 Windows XP computers (one for each of the original 80,000 computers) for use in its approximately 5,300 Chase branches. JP Morgan also explained that they hoped that by using SoftXpand, they would be able to forego the purchase of the additional 80,000 computers, and limit their purchase to an additional 80,000 desktop touch screens that would be connected to each of the 80,000 original computers.

150. During the July 18, 2011 communications, JP Morgan Chase noted that SoftXpand was the only product that could fully support JP Morgan's IT expansion plans. In particular, by using SoftXpand, JP Morgan Chase could add 80,000 touch screens to their computers that were running Windows XP. Then, when they were ready to migrate the 80,000 computers to Windows 7, SoftXpand could still be used because SoftXpand products worked on both Windows XP and Windows 7.

151. JP Morgan Chase also informed MiniFrame during the July 18, 2011 communications that they estimated the total cost of purchasing 80,000 new touch screen computers running Windows XP, plus the cost of then migrating 160,000 to Windows 7 was roughly $100 million per year over a three year period. The use of SoftXpand would save JP Morgan Chase at least 50% of those costs.

152. JP Morgan Chase also noted that they had already contacted Microsoft regarding the proposed arrangement, and that Microsoft had approved it. This may have occurred, in part, because JP Morgan Chase already had a site license from Microsoft for its use of Windows that was based on a "per number of users" cost.

153. On or about July 19, 2011, possibly the very next day, Microsoft contacted JP Morgan Chase and revoked its previous approval of this arrangement. Microsoft's reasoning for the revocation was based on the Single User Restriction language in the EULA.

154. JP Morgan Chase informed MiniFrame of Microsoft's revocation, and indicated that they could not go forward with the SoftXpand solution without Microsoft's approval.

155. After communications with MiniFrame, JP Morgan Chase contacted Microsoft and asked for reconsideration of the revocation. Microsoft refused to change its decision. When pressed, Microsoft stated that Microsoft would refuse to provide any technical support to JP Morgan Chase if they installed SoftXpand on the JP Morgan Chase computers to create shared PC systems. The results of this communication were subsequently relayed to MiniFrame.

156. MiniFrame asked JP Morgan Chase whether they would be willing to buy an additional client operating system license from Microsoft for each of the new touch screens, and JP Morgan Chase agreed to do just that if Microsoft would approve the use of SoftXpand for this project.

157. MiniFrame contacted Microsoft and requested a conference call to discuss the potential deal with JP Morgan Chase. That call occurred on or about August 11, 2011.

158. During the August 11, 2011 conference call, MiniFrame's CEO Raz Rafaeli described the situation as a win-win-win scenario, whereby JP Morgan Chase would pay Microsoft for a full Windows Client License for each new touch screen that would be connected to an existing PC via SoftXpand. In the end, JP Morgan Chase would save hundreds of millions of dollars and have 80,000 less PCs to support, Microsoft would make one of its larger customers

- 34 -

extremely happy, Microsoft would receive additional licensing revenue, and MiniFrame would get a significant sale of SoftXpand.

159. Raz Rafaeli further explained that, in this specific situation, Microsoft could not reasonably take the position that the Single User Restriction in Microsoft's licensing terms was violated because both the PC and the additional touch screen would each have its own client operating system license.

160. Microsoft, however, continued to argue that even though JP Morgan Chase was willing to pay for a separate client license for each device, the implementation would "technically" still be a shared PC system using a Windows Client Operating System, and that as such, was not permitted. Microsoft then offered its own MPS product as an option for JP Morgan Chase. Raz Rafaeli pointed out how that was impractical at least because Microsoft's MPS does not have a Windows XP option, which JP Morgan Chase required. In response, Microsoft offered to put JP Morgan Chase in touch with someone who could provide support calls to assist JP Morgan in migrating the 80,000 PCs from Windows XP to MultiPoint Server.

161. The results of the August 11, 2011 call were transmitted to JP Morgan Chase who then terminated the discussions related to the use of MiniFrame's SoftXpand products.

162. JP Morgan Chase's decision to terminate the JP MorganChase-MiniFrame discussions was based on Microsoft's objections and Microsoft's threat to withdraw technical support from JP Morgan Chase.

163. Microsoft's conduct has therefore restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $20 million dollars from this project.

- 35 -

164.     Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

165.     Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

## VII.   MICROSOFT INJURED MINIFRAME, RESTRAINED COMPETITION AND INTERFERED WITH MINIFRAME'S BUSINESS

166.     Microsoft has intimidated and threatened numerous OEMs, potential customers and MiniFrame's other potential business partners.

167.     As set forth in the following subsections, Microsoft's anticompetitive conduct has caused MiniFrame to lose countless deals with OEMs and partners that may have exceeded more than $2 billion dollars. For example, MiniFrame had serious discussions with OEMs such as Samsung, Toshiba, LG, Nvidia, and Hewlett-Packard, but in each instance, when the OEM approached Microsoft for approval to continue working with MiniFrame, Microsoft said "No."

168.     As set forth in the following subsections, Microsoft's anticompetitive conduct has caused MiniFrame to lose more than $60 million dollars in deals with value added resellers and customers.

169.     As set forth in the following subsections, Microsoft's anticompetitive conduct has caused MiniFrame to lose more than $95 million dollars in bundle deals with vendors such as Diamond, Hanshin, Spina, Wisair, Sparkle, IOGEAR, and Good Way (as well as others). In this instance, each of these potential partners develops and market devices that are built around DisplayLink technology, such as DisplayLink video over USB technology.

170.    DisplayLink and MiniFrame initially had a very friendly and fruitful relationship based on the version of SoftXpand that works with Windows XP. DisplayLink, however, terminated all support for SoftXpand and focused instead on supporting Microsoft's MPS as soon as it was released to the public. DisplayLink suggested that it stopped supporting SoftXpand due to a licensing issue MiniFrame has with Microsoft. Because DisplayLink still refuses to support the Windows 7 version of SoftXpand, MiniFrame cannot partner with any of the companies such as Diamond, Hanshin, Wisair, Sparkle, IOGEAR, and Good Way, among others that rely on DisplayLink technology for their products.

A.    **OEM DEAL - SAMSUNG**

171.    Samsung is an OEM engaged in the business of, *inter alia*, manufacturing and distributing Samsung branded computing products.

172.    In January 2011 and early March 2011, MiniFrame and Samsung met at Samsung's offices in Korea to discuss the potential for MiniFrame's SoftXpand technology and how it may have beneficial uses if it were integrated into Samsung's product line. Samsung was "very impressed" with the SoftXpand technology and indicated that it "might fit Samsung Monitor product roadmap for both the B2B and B2C markets."

173.    However, on or about March 17, 2011, Samsung informed MiniFrame that "[s]urprisingly, Microsoft stated that MiniFrame's technology is against MS policy and will cause a legal problem if Samsung would use it." Therefore, Samsung would not be using MiniFrame's SoftXpand product or working with MiniFrame.

174.    Based on MiniFrame's attempts to try and resolve the licensing issues with Microsoft, MiniFrame and Samsung continued to discuss the use of SoftXpand on Samsung's new Media Center. Even though MiniFrame explained that the Samsung solutions that included SoftXpand were going to be single user configurations (which therefore, could not

violate Microsoft's Single User Restriction), Microsoft was steadfast in refusing to grant permission to Samsung to work with MiniFrame under any circumstance.

175. On or about June 28, 2011, Samsung again informed MiniFrame of Microsoft's position that the use of SoftXpand "will be against MS license policy."

176. On or about June 29, 2011, without any change in Microsoft's position, Samsung stated that "we would not commence this kind of biz. without an official confirmation of MS."

177. Samsung terminated these discussions with MiniFrame based on interference by Microsoft.

178. In 2009, approximately 38% of Samsung's revenue came from their Digital Media segment, which includes PCs and other electronic devices.

179. Upon information and belief, Samsung holds a System Builder License from Microsoft that permits Samsung to pre-install Windows Client Operating Systems in the PCs it sells.

180. Samsung refused to do business with MiniFrame at least because of Microsoft's threats regarding the Single User Restriction in the EULA.

181. Thus, Microsoft's conduct has restrained competition, causing direct injury to MiniFrame. MiniFrame stood to earn more than $250 million dollars from these projects.

182. Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

- 38 -

183.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

**B.    OEM DEAL - TOSHIBA**

184.    Toshiba is an OEM engaged in the business of, *inter alia*, manufacturing and distributing Toshiba branded computing products.

185.    On or about May 16, 2011, Toshiba contacted MiniFrame and informed them that "we are interested in the application of your solution in notebook and TV, so please introduce us how your solution works in those devices, and what's the benefit for us to adopt your solution."

186.    On May 24, 2011, Toshiba informed MiniFrame that "[w]e're interested in you software solution, which enables multiple users to uses [sic] the computing power of single PC or notebooks. It matchs [sic] the idea of home networking very well."

187.    On or about June 23, 2011, MiniFrame presented a joint project (SoftXpand bundle with Toshiba laptop) to Toshiba. MiniFrame's presentation was well received by Toshiba.

188.    On or about July 22, 2011, Toshiba informed MiniFrame that "...Microsoft not recommend to Pre-Install this application. It will affect their license model." As a result, Toshiba could not work with MiniFrame on this project.

189.    Toshiba terminated these discussions with MiniFrame based on interference by Microsoft.

190.    In 2010, 37% of Toshiba's revenue came from their Digital Products segment, which includes PCs and other electronic devices.

191.    Upon information and belief, Toshiba holds a System Builder License from Microsoft that permits Toshiba to pre-install Windows Client Operating Systems in the PCs it sells.

192.    Upon information and belief, Toshiba refused to do business with MiniFrame due to Microsoft's threats regarding the Single User Restriction in the EULA.

193.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $400 million dollars a year from this project over a four year period.

194.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

195.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

C.    **OEM DEAL - LG**

196.    LG is an OEM engaged in the business of, *inter alia*, manufacturing and distributing LG branded computing products.

197.    On or about March 30, 2011, LG informed MiniFrame of "real business opportunities from this partnership." These opportunities included the use of SoftXpand with Windows 7 to address the consumer segment of the multi-user software market and with Windows Server 2008 R2 to address the business segment of the market. While MiniFrame and LG continue to have discussions regarding potential business opportunities, most of those opportunities are on hold pending approval from Microsoft (which approval Microsoft has thus far refused to grant).

198. In most instances, LG relies on technology provided by DisplayLink to implement critical features required when utilizing SoftXpand.

199. In its March 30, 2011 response, LG indicated, however, that "At this time, DisplayLink can not undertake this work and DisplayLink has a relationship with Microsoft which cannot be jeopardized in any way."

200. LG terminated these discussions with MiniFrame based on interference by Microsoft.

201. In 2010, 25% of LG's revenue came from their Mobile Communications segment, which includes PCs and other electronic devices.

202. Upon information and belief, LG holds a System Builder License from Microsoft that permits LG to pre-install Windows Client Operating Systems in the PCs it sells.

203. LG essentially refused to do business with MiniFrame due to Microsoft's threats regarding the Single User Restriction in the EULA.

204. Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $750 million dollars from this project.

205. Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

206. Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

D. **OEM DEAL - NVIDIA**

207. Nvidia is an OEM engaged in the business of, *inter alia*, manufacturing and distributing Nvidia brand computing products. In particular, Nvidia specializes in the

- 41 -

development of graphics processing units, chipset technologies and video cards for workstations, PCs and mobile devices.

208.    On or about January 17, 2011, MiniFrame met with Alain Tiquet, Nvidia's Group Director, Business Development, to discuss potential areas for collaboration between the companies. Alain was very impressed and suggested the possibility of integrating SoftXpand into one or more of Nvidia software drivers.

209.    During a conference call on or about February 16, 2011, the Microsoft licensing issue was raised and all further discussions were terminated.

210.    Nvidia terminated these discussions with MiniFrame based on interference by Microsoft.

211.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $450 million dollars from this project.

212.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

213.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

E.    OEM DEAL - HEWLETT-PACKARD

214.    As previously discussed in paragraphs 92 through 112 (all of which are incorporated herein), HP and MiniFrame were in discussions to develop a product for the PC sharing market that abruptly ended.

215.    HP's decision to terminate the HP-MiniFrame PC Sharing solution is due to interference by Microsoft.

216. Shortly after terminating its relationship with MiniFrame, HP launched the "HP MultiSeat Computing Solution," which is a multi-user configuration that shares a single operating system on a single PC (*i.e.*, a shared PC system). Instead of using MiniFrame's SoftXpand software to create this multi-user configuration from a single PC, the HP MultiSeat Computing Solution used Microsoft's MPS software.

217. Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $200 million dollars from this project.

218. Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

219. Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

F.     **PARTNER DEALS – FRANCE**

220. Addjust Technologies is a company in France that distributes information technology solutions, including MiniFrame's SoftXpand products.

221. On or about June 2010, Microsoft contacted Addjust Technologies and delivered a message that MiniFrame's SoftXpand products were violating Microsoft's license terms. Shortly thereafter, Addjust contacted MiniFrame and informed them of the substance of the communications.

222. On or about June 14, 2010, MiniFrame contacted Microsoft and informed them that "emails like the one you sent to Addjust Technologies, are very damaging for MiniFrame business, as for our global channel partners. We would appreciate that you refrain from sending such email in the future."

- 43 -

223.    On or about April 21, 2011, Olivier Le Thiec, CEO of Addjust Technologies stated to MiniFrame that, "We have to get from Microsoft a very urgent and clear position. Our business is currently totally stopped and we had a big problem with an importagt [sic] French region. Microsoft told us that what we are doing is illegal. We lost the business. We also lost other business for the same reason."

224.    On or about May 17, 2011, Manilo Vecchiet, Director of Product Management Windows Server of Microsoft informed Olivier Le Thiec of Addjust Technologies that "Windows Server and MPS (and not Windows client) are the only Operating Systems licensed for multi-user computing."

225.    On or about May 18, 2011, Oliveir Le Thiec stated "Following Microsoft communication [sic] in France, I lost my major partner due to this legal aspect and he moved to Multipoint and NComputing."

226.    Addjust Technologies and MiniFrame lost business because of interference by Microsoft.

227.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $5 million dollars from this project.

228.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

229.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

## G. CUSTOMER DEALS – UNITED KINGDOM

230. Due to a number of its customers expressing their concern about Microsoft's Single User Restrictions, MiniFrame contacted Microsoft in the UK on numerous occasions hoping to resolve this issue.

231. Unable to make any progress, MiniFrame contacted a member of the United Kingdom Parliament to try and contact Microsoft to resolve this licensing dispute. That member of Parliament informed MiniFrame that he had spoken with Microsoft's Government Affairs Officer in the UK. The member of Parliament indicated that he did not believe there were any licensing issues regarding the operating system.

232. Microsoft, however, has thus far refused to cooperate and confirm that the use of SoftXpand's products are acceptable. Instead, Microsoft communicated to many of MiniFrame's partners and customers the positions set forth in its Volume Licensing Brief – namely that the only acceptable multi-user configuration is one based on either Windows Server 2008 R2 or Microsoft's MPS. Consequently, customers refused to do any further business with MiniFrame.

233. Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $23 million dollars from various projects.

234. Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

235. Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

### H.    CUSTOMER DEALS – BELGIUM

236.    On or about September 20, 2010, Microsoft advised FD-Computers, which

sells a Multiseat System based on MiniFrame's SoftXpand products, that its configuration is "not

correct and against the license term of Windows 7." Microsoft went further to remind FD-

Computers that "only one user at a time may use the Windows on the licensed PC. This

paragraph is clearly invalidating the usage that you do of Windows on the multiseat system."

Microsoft even stated that FD-Computers should "[i]nform your customers already using this

system that they are not compliant…"

237.    On or about September 23, 2010, Microsoft warned MiniFrame that its

EULA "states clearly that Windows cannot be shared on multiple devices." Microsoft went

further to state "I think it is important that you correct this and inform your customers about the

possible lack of correct licensing."

238.    Thus, Microsoft's conduct has restrained competition and caused direct

injury to MiniFrame. MiniFrame stood to earn more than $2 million dollars from this project.

239.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-

user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of

success that Microsoft will obtain a monopoly in the multi-user software market.

240.    Microsoft's conduct also confirms the dangerous probability of success

that Microsoft will obtain a monopoly in the market for PC sharing software.

### I.    PARTNER DEAL – PORTUGAL

241.    On or about January 13, 2009, MiniFrame met with Rui Costa in Portugal.

242.    On or about September 2, 2009, Americo Silva of Porto Editora informed

MiniFrame that Microsoft considers each of SoftXpand's "workstations" as a "Device" that

needs a license.

243.    Microsoft claimed that each device connected to the operating system needs a separate license, and that there was not a requirement that the operating system be installed on a hard disk drive.  Instead, if a user just interacts with the Windows user interface on a device, then that device needs to be licensed.

244.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame.  MiniFrame stood to earn more than $10 million dollars from this project.

245.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market.  Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

246.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

**J.      CUSTOMER DEAL - JP MORGAN CHASE**

247.    As previously discussed in paragraphs 148 through 165 (and incorporated by reference herein), JP Morgan Chase and MiniFrame were in discussions to implement the SoftXpand product in 80,000 computers belonging to JP Morgan Chase.

248.    JP Morgan terminated those discussions based on interference by Microsoft.

249.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame.  MiniFrame stood to earn more than $20 million dollars from this project.

250.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market.  Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

251.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

- 47 -

K.    BUNDLE DEAL – DIAMOND MULTIMEDIA

252.    Diamond Multimedia ("Diamond") is a company engaged in the business of, *inter alia*, manufacturing and distributing Diamond brand computing products.

253.    On or about May 17, 2011, MiniFrame reached out to Diamond to discuss a video-card and DisplayLink bundle project. Both companies agreed on virtually all business and technical aspects of the proposed bundled products.

254.    On or about June 5, 2011, less than one month later, Diamond informed MiniFrame that it would only be interested in this project "when you get MS certificated."

255.    Diamond terminated these discussions with MiniFrame based on interference by Microsoft.

256.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $10 million dollars from this project.

257.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

258.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

L.    BUNDLE DEAL - HANSHIN

259.    Hanshin Information Technology Co., Ltd. ("Hanshin") is a Korean company engaged in the business of, *inter alia*, manufacturing and distributing Hanshin brand computing products.

260.    MiniFrame and Hanshin signed a partnership agreement on October 16, 2010. Based on this agreement, Hanshin committed to sell its USB docking station bundled with SoftXpand for both Windows XP and Windows 7 operating systems (both Windows Client

- 48 -

Operating Systems). Due to the issue with DisplayLink support caused by Microsoft's conduct and/or interference, Hanshin decided to redevelop the product based on another technology that did not involve SoftXpand.

261.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $20 million dollars from this project.

262.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

263.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

## M.    BUNDLE DEAL - SPINA

264.    Spina Systems Inc ("Spina") is a company engaged in the business of, *inter alia*, manufacturing and distributing Spina brand computing products.

265.    MiniFrame and Spina signed a partnership agreement on June 17, 2010. Based on this agreement, Spina committed to sell its USB docking station bundled with SoftXpand for both Windows XP and Windows 7 operating systems (both Windows Client Operating Systems). Due to the issue with DisplayLink support caused by Microsoft's conduct and/or interference, Spina decided to redevelop the product based on another technology that did not involve SoftXpand.

266.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $15 million dollars from this project.

267.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

268. Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

### N. BUNDLE DEAL - WISAIR

269. Wisair is a company engaged in the business of, *inter alia*, manufacturing and distributing Wisair brand computing products.

270. MiniFrame and Wisair conducted a number of discussions regarding the use of Wisair's products in connection with SoftXpand. These discussions ceased because of the issue with DisplayLink support caused by Microsoft's conduct and/or interference.

271. Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $3 million dollars from this project.

272. Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

273. Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

### O. BUNDLE DEAL - SPARKLE

274. Sparkle Computer Co., Ltd ("Sparkle") is a company engaged in the business of, *inter alia*, manufacturing and distributing Sparkle brand computing products.

275. MiniFrame and Sparkle conducted a number of discussions regarding the use of Sparkle's products in connection with SoftXpand. These discussions ceased because of the issue with DisplayLink support caused by Microsoft's conduct and/or interference.

276. Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $2 million dollars from this project.

277.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

278.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

P.    **BUNDLE DEAL - IOGEAR**

279.    IOGEAR is a company engaged in the business of, *inter alia*, manufacturing and distributing IOGEAR brand computing products.

280.    MiniFrame and IOGEAR conducted a number of discussions regarding the use of IOGEAR's products in connection with SoftXpand. These discussions ceased because of the issue with DisplayLink support caused by Microsoft's conduct and/or interference.

281.    Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $25 million dollars from this project.

282.    Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

283.    Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

Q.    **BUNDLE DEAL – GOOD WAY**

284.    Good Way Technology Co., Ltd. ("Good Way") is a company engaged in the business of, *inter alia*, manufacturing and distributing Good Way brand computing products.

285.    Display Link introduced Good Way to MiniFrame in February of 2010. During April 2010, Good Way tested SoftXpand and experienced successful results. Good Way subsequently entered into negotiations with MiniFrame to establish a high volume distribution

agreement, but eventually ended the relationship because of problems with SoftXpand and Microsoft licensing.

286. Good Way terminated this relationship with MiniFrame based on interference by Microsoft.

287. Thus, Microsoft's conduct has restrained competition and caused direct injury to MiniFrame. MiniFrame stood to earn more than $20 million dollars from this project.

288. Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

289. Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

## VIII. MICROSOFT'S PRIOR DEALINGS WITH NCOMPUTING ESTABLISH A PATTERN OF SUCCESSFULLY RESTRAINING COMPETITION IN THE RELEVANT MARKETS

290. Prior to the advent of Microsoft's Single User Restriction, customers who sought NComputing Products to create a shared PC system from a single Windows Client Operating System on a single desktop PC did not need to purchase any additional software or license from Microsoft. NComputing claimed to have more than 20 million users in over 140 countries, with over 2 million users in the USA alone.

291. After the Single User Restriction was created by Microsoft, customers seeking to use NComputing's vSpace products to create a shared PC system also needed to purchase a license to Microsoft's Windows Server Operating System (*i.e.*, Windows Server 2008 R2) as well as the appropriate number of CALs (*i.e.*, a Windows Server 2008 R2 CAL for each user). However, from a technological standpoint, neither a Windows Server 2008 R2 nor CAL

of any kind is needed to create a shared PC system with a single Windows Client Operating System on a single PC.

292.     After MPS was launched in 2010, customers seeking to use NComputing's vSpace software to create a shared PC system needed to purchase a license to Microsoft's MPS, a CAL for Windows Server 2008 R2, and a CAL for the MPS. However, from a technological standpoint, neither a Windows MultiPoint nor CAL of any kind is needed to create a shared PC system with a single Windows Client Operating System on a single PC.

293.     Based on an NComputing press release, NComputing agreed to align with the Windows Server Operating System technology. As part of the agreement, NComputing would develop the next generation of its hardware and vSpace software products to take advantage of current and future Windows Server Operating Systems for multiuser computing, such as the forthcoming Windows MultiPoint Server.

294.     On information and belief, NComputing and Microsoft are now effectively partners, and all future NComputing Products involving shared PC systems are going to be based on Microsoft's MPS. That partnership, however, was based on NComputing effectively abandoning its PC sharing software products.

295.     Microsoft's conduct confirms Microsoft's monopoly power in the multi-user software market. Alternatively, Microsoft's conduct confirms the dangerous probability of success that Microsoft will obtain a monopoly in the multi-user software market.

296.     Microsoft's conduct also confirms the dangerous probability of success that Microsoft will obtain a monopoly in the market for PC sharing software.

IX.   **MICROSOFT'S IMPROPER ATTEMPT TO MAINTAIN AND/OR CREATE MONOPOLIES**

297.    Microsoft has used its anticompetitive activities to disrupt free market competition in various markets and gain an unfair advantage for its products.

A.    **SERVER OPERATING SYSTEM MARKET**

298.    Microsoft's ability to maintain its monopoly in the server operating system market against the competing PC sharing software (*e.g.*, MiniFrame's SoftXpand product) is due purely to Microsoft's anticompetitive conduct, and not due to any business acumen, merit or technological superiority of its Windows Server Operating System.

299.    At least as early as 2006, Microsoft sought to restrain competition from challenging the market for server operating system and its monopoly therein through the addition of an anticompetitive restriction in its Windows Client Operating System license that requires customers to install or purchase a Windows Server Operating System instead of a third-party PC sharing software with a Windows Client Operating System.

300.    Additionally, any gain in the installation of shared PC systems based on Windows Client Operating Systems is likely to come at the expense of systems using Microsoft's Windows Server Operating System as opposed to other server operating systems, such as Linux or Unix. This is due, at least in part, to the fact that customers are likely to stay with an operating system platform that works with other application software they own (*e.g.*, Microsoft's Office software), as well as an operating system they are familiar with. Thus, many customers are likely to be hesitant to switch to another operating system platform because many applications only work with a Windows operating system. In this manner, customers are likely to replace one Windows based product with another Windows based product, as opposed to a product with different programming (*e.g.*, Linux or Unix). And thus, shared PC systems based

on Windows Client Operating Systems are more likely to cause sales of Microsoft's Windows Server Operating Systems to fall much farther than sales of Linux and Unix server operating systems, thereby resulting in erosion of Microsoft's market share and consequently Microsoft's monopoly in the server operating system market. Therefore, shared PC systems based on Windows Client Operating Systems also threaten Microsoft's monopoly in the server operating systems market.

**B.    PC SHARING SOFTWARE SYSTEM MARKET**

301.    Microsoft intended and attempted to monopolize the new market for PC sharing software with its MPS product:

(a)    Microsoft's MPS product is an application that runs on top of Windows Server 2008 R2 operating system to give the host computer shared PC functionality.

(b)    On information and belief, Microsoft included the word "Server" in the MPS product name so it could modify its anticompetitive restriction to permit a shared PC configuration only with MPS or the combination of a Windows Server 2008 R2 license and third-party PC sharing software.

(c)    Microsoft then instituted a predatory pricing tactic by pricing MPS at approximately 14% (Academic) and 80% (Non-Academic) of the Windows Server 2008 R2 product (even though this operating system is an included component of the MPS installation) so that a customer in effect would have no choice but to purchase MPS instead of Windows Server 2008 R2 and third-party PC sharing software.

(d)     On information and belief, once all of the competing products have

been eliminated from the market (this includes competitors such as

MiniFrame), Microsoft will then raise the price of MPS and the

required CALs to the detriment of the customers.

302.    Through its anticompetitive conduct such as its anticompetitive license

restriction and pricing tactic with its MPS product, there is a dangerous probability that

Microsoft will effectively restrain competition and create a monopoly for itself in the market for

PC sharing software.  In fact, customers such as educational institutions and original equipment

manufacturers have increasingly abandoned third-party software such as MiniFrame's

SoftXpand product in favor of MPS as a result of Microsoft's anticompetitive restriction and

pricing tactic, and not for any reason based on Microsoft's business acumen, merit or

technological superiority.  This includes, in part, the predatory pricing advantages Microsoft

currently provides the education market such as a premium license for less than 1/6 the price a

business would pay and CALs priced at 1/3 the normal price.

**C.     MULTI-USER SOFTWARE SYSTEM MARKET**

303.    A server operating system and PC sharing software are both multi-user

software products.  Therefore, the combined market for server operating systems and PC sharing

software is known as the multi-user software market.

304.    Given that Microsoft already dominates and has a monopoly in the server

operating system market, and the market for PC sharing software is relatively new, Microsoft

thus has a dominant position and monopoly in this multi-user software market.  Through its

anticompetitive conduct such as its anticompetitive license restriction and/or pricing tactic with

its MPS product, Microsoft is thus attempting to maintain its monopoly in this multi-user

software market.

305.    In the alternative, to the extent that Microsoft does not yet have a monopoly in this multi-user software market, Microsoft is using its anticompetitive conduct to create a monopoly in this multi-user software market. By using its anticompetitive license restriction and/or pricing tactic with its MPS product, there is a dangerous probability that Microsoft's anticompetitive conduct will effectively restrain competition and create a monopoly for Microsoft in this multi-user software market. In fact, customers such as educational institutions and original equipment manufacturers have increasingly abandoned third-party software such as MiniFrame's SoftXpand products in favor of MPS products as a result of Microsoft's anticompetitive restriction and pricing tactic, and not for any reason based on Microsoft's business acumen, merit or technological superiority.

## X.    MICROSOFT ENGAGES IN UNFAIR COMPETITION

306.    As described in Sections IV-IX, supra, Microsoft has used its monopoly power and anticompetitive tactics to disrupt free market competition for PC sharing and/or multi-user software, and instead has created a scenario in which Microsoft's licensing terms prohibiting third-party PC sharing software and/or Microsoft's predatory pricing of MPS has or will restrain competition.

307.    Microsoft's conduct causes or is likely to cause substantial injury to customers, including the restraint of competition, the purchase of unnecessary products, price discrimination, etc. and other acts detailed in, supra, Sections IV-IX.

308.    Customers cannot reasonably avoid injury from Microsoft's conduct because Microsoft coerces them into purchasing unwanted products through its monopoly power.

309.    There are no countervailing benefits to customers or competition caused by Microsoft's conduct. Prices are higher for customers who wish to use a third part PC sharing

software to created a shared PC system and there is effectively less product choices due to Microsoft's license terms and pricing behavior.

## XI. MICROSOFT'S TORTIOUS INFERENCE WITH MINIFRAME'S BUSINESS

310. As described in Sections IV-IX, *supra*, MiniFrame has, or has had, economic relationships with various customers who purchase and use MiniFrame's product.

311. Microsoft is and has been aware of MiniFrame's relationship with these customers.

312. Microsoft took deliberate actions that were designed to disrupt, and in fact have disrupted, the relationship between MiniFrame and its customers by informing them that the use of MiniFrame's product would be in violation of Microsoft's EULA.

313. As described in Sections IV-IX, *supra*, MiniFrame has or had developed a potential economic relationship with customers who were interested in purchasing and using MiniFrame's product.

314. Microsoft is and has been aware of MiniFrame's relationship with these potential customers.

315. Microsoft took deliberate actions that were designed to disrupt, and in fact have disrupted, the relationship between MiniFrame and its potential customers by informing them that the use of MiniFrame's product would be in violation of Microsoft's EULA.

316. But for the intentional, wrongful, and malicious acts and interference of Microsoft, HP would have entered into a contractual relationship with MiniFrame.

317. But for the intentional, wrongful, and malicious acts and interference of Microsoft, Samsung would have entered into a contractual relationship with MiniFrame.

318. But for the intentional, wrongful, and malicious acts and interference of Microsoft, Toshiba would have entered into a contractual relationship with MiniFrame.

319.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, LG would have extended its contractual relationship with MiniFrame.

320.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, JP Morgan would have entered into a contractual relationship with MiniFrame.

321.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, Nvidia would have entered into a contractual relationship with MiniFrame.

322.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, Diamond would have entered into a contractual relationship with MiniFrame.

323.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, Hanshin would have extended and expanded its contractual relationship with MiniFrame.

324.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, Spina would have extended and expanded its contractual relationship with MiniFrame.

325.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, Wisair would have entered into a contractual relationship with MiniFrame.

326.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, Sparkle would have entered into a contractual relationship with MiniFrame.

327.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, IOGEAR would have entered into a contractual relationship with MiniFrame.

328.    But for the intentional, wrongful, and malicious acts and interference of Microsoft, Good Way would have entered into a contractual relationship with MiniFrame.

329. The motive for Microsoft's intentional, wrongful, and malicious acts and interference was to harm MiniFrame.

330. Microsoft's conduct was intentional and designed to disrupt MiniFrame's economic relationships.

331. Microsoft's conduct has caused MiniFrame to lose more than $2 billion dollars in deals with OEMs such as Samsung, Toshiba, LG, Nvidia, Hewlett-Packard.

332. Microsoft's conduct has caused MiniFrame to lose more than $60 million dollars in deals with value added resellers and customers.

333. Microsoft's conduct has caused MiniFrame to lose more than $95 million dollars in bundle deals with vendors such as Diamond, Hanshin, Spina, Wisair, Sparkle, IOGEAR, and Good Way.

## XII.   CLAIMS FOR RELIEF

### A.   COUNT I – VIOLATION OF SECTION 2 OF SHERMAN ACT: MAINTAINING MONOPOLIZATION OF SERVER OPERATING SYSTEM MARKET

334. The allegations of paragraphs 1 through 333 are incorporated herein by reference.

335. Microsoft possesses monopoly power in the server operating system market. Through the anticompetitive conduct described herein, Microsoft has willfully maintained, and unless restrained by the Court, will continue to willfully maintain that power by anticompetitive and unreasonably exclusionary conduct. Microsoft has acted with an intent to illegally maintain its monopoly power in the server operating system market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**B.**     **COUNT II – VIOLATION OF SECTION 2 OF THE SHERMAN ACT: ATTEMPTED MONOPOLIZATION OF THE PC SHARING SOFTWARE MARKET**

336.     The allegations of paragraphs 1 through 335 are incorporated herein by reference.

337.     Microsoft has willfully engaged, and is engaging, in a course of conduct in order to obtain a monopoly in the PC sharing software market, and there is a dangerous probability of success that, unless restrained, it will succeed in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Microsoft has acted with a specific intent to monopolize, and to destroy effective competition in, the PC sharing software market.

**C.**     **COUNT III – VIOLATION OF SECTION 2 OF THE SHERMAN ACT: MAINTAINING MONOPOLIZATION OF MULTI-USER SOFTWARE MARKET**

338.     The allegations of paragraphs 1 through 337 are incorporated herein by reference.

339.     Microsoft possesses monopoly power in the multi-user software market. Through the anticompetitive conduct described herein, Microsoft has willfully maintained, and unless restrained by the Court, will continue to willfully maintain that power by anticompetitive and unreasonably exclusionary conduct. Microsoft has acted with an intent to illegally maintain its monopoly power in the multi-user software market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**D.**     **COUNT IV – VIOLATION OF SECTION 2 OF THE SHERMAN ACT: ATTEMPTED MONOPOLIZATION OF THE MULTI-USER SOFTWARE MARKET**

340.     The allegations of paragraphs 1 through 339 are incorporated herein by reference.

341.     Microsoft has willfully engaged, and is engaging, in a course of conduct in order to obtain a monopoly in the multi-user software market, and there is a dangerous probability of success that, unless restrained, it will succeed in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Microsoft has acted with a specific intent to monopolize, and to destroy effective competition in, the multi-user software market.

E.     **COUNT VII – VIOLATION OF DONNELLY ACT, N.Y. GEN. BUS. LAW § 340**

342.     The allegations of paragraphs 1 through 341 are incorporated herein by reference.

343.     Microsoft's conduct as described in this Complaint amounts to an unlawful and/or unfair business practice within the meaning of Donnelly Act, N.Y. Gen. Bus. Law § 340.

F.     **COUNT VIII – VIOLATION OF RCW 19.86.040**

344.     The allegations of paragraphs 1 through 343 are incorporated herein by reference.

345.     Microsoft possesses monopoly power in the server operating system and/or the multi-user software market. Through the anticompetitive conduct described herein, Microsoft has willfully maintained, and unless restrained by the Court, will continue to willfully maintain that power by anticompetitive and unreasonably exclusionary conduct. Microsoft has acted with an intent to illegally maintain its monopoly power in the multi-user software market, and its illegal conduct has enabled it to do so, in violation of RCW 19.86.040.

346.     Microsoft has willfully engaged, and is engaging, in a course of conduct in order to obtain a monopoly in the PC sharing software and/or multi-user software market, and there is a dangerous probability of success that, unless restrained, it will succeed in violation of

- 62 -

RCW 19.86.040. Microsoft has acted with a specific intent to monopolize, and to destroy effective competition in, the PC sharing software and multi-user software market.

### G. COUNT IX – VIOLATION OF RCW 19.86.020

347. The allegations of paragraphs 1 through 346 are incorporated herein by reference.

348. Microsoft's conduct as described in this Complaint amounts to an unfair method of competition in violation of RCW 19.86.020.

### H. COUNT X – VIOLATION OF UNFAIR COMPETITION COMMON LAW

349. The allegations of paragraphs 1 through 348 are incorporated herein by reference.

350. Microsoft's conduct as described in this Complaint amounts to an unlawful and/or unfair business practice within the meaning of the common law of unfair competition.

### I. COUNT XI – TORTIOUS INFERENCE

351. The allegations of paragraphs 1 through 350 are incorporated herein by reference.

352. Through the anticompetitive conduct described herein, Microsoft has willfully and tortiously interfered with MiniFrame's business relationships.

### XIII. PRAYER FOR RELIEF

353. WHEREFORE, Plaintiff MiniFrame requests entry of judgment in its favor and against Defendant as follows:

> (a) That Microsoft's conduct in requiring customers to license a Windows Server Operating System or MPS to create a shared PC system violates:

(i)     Section 2 of the Sherman Act, 15 U.S.C. § 2;

(ii)    Donnelly Act, N.Y. Gen. Bus. Law § 340;

(iii)   RCW 19.86.020;

(iv)   RCW 19.86.040; and

(v)    unfair competition common law;

(b)    That Microsoft has willfully maintained its monopoly in the server operating systems market in violation of Section 2 of the Sherman Act, 5 U.S.C. § 2;

(c)    That Microsoft has attempted to monopolize the market for PC sharing software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(d)    That Microsoft has willfully maintained its monopoly in the multi-user software market in violation of Section 2 of the Sherman Act, 5 U.S.C. § 2;

(e)    That Microsoft has attempted to monopolize the market for multi-user software in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(f)    That Microsoft's pricing behavior violates Section 2 of the Sherman Act, 15 U.S.C. § 2,

(g)    That Microsoft has unlawfully interfered with MiniFrame's business relationships;

(h)    That Microsoft, all persons acting on its behalf or under its direction or control, and all successors thereto, be preliminarily and permanently enjoined from:

- 64 -

(i)     Requiring any customers to license a Windows Server Operating System or MPS to create a shared PC system;

(ii)    Requiring any customers to agree not to do business with MiniFrame;

(iii)   Taking or threatening any action adverse to any customer in whole or in part as a direct or indirect consequence of doing business with MiniFrame;

(iv)   Interfering in any business relationships of MiniFrame;

(i)     That the Court enter such other preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by Microsoft's unlawful conduct;

(j)     For not less than $ 1,000,000,000 in damages;

(k)    For reasonable attorneys' fees;

(l)     For punitive and/or trebled damages;

(m)   For cost of suit herein incurred; and

(n)    For any other and further relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands

trial by jury of all issues properly triable of right by a jury.

Dated: October 19, 2011

Respectfully submitted,

By: _____

Robert Morris, Esq.
rmorris@kramerlevin.com
Timothy Helwick, Esq.
thelwick@kramerlevin.com
Kramer Levin Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036
212-715-9100

Attorneys for Plaintiff MiniFrame Ltd.

KL3 2849565.1