UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────

No. 11 Civ. 7419 (RJS)

───────────────────

MINIFRAME LTD.,

Plaintiff,

VERSUS

MICROSOFT CORPORATION,

Defendant.

───────────────────

MEMORANDUM AND ORDER
March 28, 2013

───────────────────

RICHARD J. SULLIVAN, District Judge:

MiniFrame Ltd. ("MiniFrame") brings this antitrust action against Microsoft Corporation ("Microsoft"), asserting violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, New York and Washington state law, and common law. Before the Court is Microsoft's motion to dismiss MiniFrame's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Microsoft's motion is granted.

I. BACKGROUND

A. Facts

Microsoft, a Washington corporation, sells, distributes, and licenses the popular software program Windows. As part of its product array, Microsoft offers various client operating systems, such as Windows XP and Windows 7, that are designed to run on personal computers ("PCs").[1] (Compl. ¶ 26.) In addition, Microsoft offers various Windows server operating systems, such as Windows Essential Business Server and Windows Home Server 2011, that are designed to run on servers. (*Id.* ¶ 27.) Prior to 2007, Microsoft did not include a restriction in its licenses on the number of *users* who could simultaneously access a single Windows client operating system.

---

[1] The facts are drawn from the Complaint ("Compl.") and the documents and exhibits attached thereto. In deciding the instant motion, the Court also considered Defendant's Memorandum of Law ("Mem."), Plaintiff's Opposition ("Opp'n"), Defendant's Reply ("Reply"), and the transcript of oral argument, held on May 11, 2012 ("Tr.").

(*Id*. ¶ 37.) Instead, Microsoft limited the number of *computers* that could run its software at the same time. (*Id*. ¶ 53.) Thus, under a pre-2007 license, multiple users could access one copy of the Windows operating system simultaneously, as long as they did so from one computer. (*Id*. ¶ 56.)

In 2003, MiniFrame, an Israeli corporation, developed its "SoftXpand" line of PC-sharing software, which "permitted multiple users to simultaneously access and use a single Windows Client Operating System on a single PC" by using peripherals such as a monitor, keyboard, and mouse. (*Id*. ¶ 40.) While multi-user systems are typically hosted on servers – and therefore require a server operating system and a client license for each PC accessing the server – SoftXpand permitted users to share one PC and one client operating system. (*Id*. ¶¶ 44-46.) Because only one computer was used to run the client operating system, SoftXpand users were in compliance with the Microsoft licensing agreement. (*Id*. ¶ 40.) Accordingly, the cost of one Microsoft license for a multi-user SoftXpand system was significantly less than the cost of multiple licenses for a comparable server-based system. (*Id*.) Perhaps not surprisingly, MiniFrame's software has since been "used in over [thirty] countries." (*Id.*)

In 2007, Microsoft modified the licensing agreements for its client operating systems to include a single-user restriction. (*Id*. ¶¶ 58-59.) Pursuant to this restriction, any Microsoft customer installing a multi-user system had to license software for each user. (*Id*. ¶¶ 64-65.) Plaintiff alleges that "there is no technological reason why multiple users cannot access or use the same Windows Client Operating System at the same time." (*Id*. ¶ 66.) Nevertheless, as a result of the license modification, SoftXpand users were required to license software for each user, significantly increasing the cost of the system. (*Id*. ¶ 131.) At the same time, Microsoft was developing and in 2010 would release its own multi-user software, Windows MultiPoint Server ("MPS"). (*Id*.) Plaintiff argues that, because MPS is less expensive than the combination of SoftXpand and additional Microsoft licenses, customers "practically have no choice but to purchase [MPS] for any shared PC system." (*Id*. ¶ 135.) Moreover, Plaintiff accuses Microsoft of "wrongfully refus[ing] to deal and cooperate with MiniFrame, and its partners and customers, on commercially reasonable and non-discriminatory terms" in the multi-user software market. (*Id.* ¶ 146.) As a result, Plaintiff alleges it lost a significant amount of business to Microsoft from both American and foreign companies. (*See* ¶¶ 148-289.)

B.  Procedural History

Plaintiff commenced this action by filing its Complaint on October 19, 2011. (Doc. No. 1.) The Complaint states the following claims against Microsoft: (1) violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, for (a) monopolization of the server operating system market, (b) attempted monopolization of the PC sharing software market, (c) monopolization of the multi-user software market, and (d) attempted monopolization of the multi-user software market; (2) violation of New York's Donnelly Act, N.Y. Gen. Bus. Law § 340; (3) violation of Washington State's antitrust law, Wash. Rev. Code § 19.86.040, and unfair competition law, *Id.* § 19.86.020; and (4) common law claims for unfair competition and tortious interference with MiniFrame's business relationships.[2] (Compl. ¶¶ 334-52.)

---

[2] In its opposition papers, MiniFrame cites only New York law to support its common law unfair

Microsoft filed its motion to dismiss on March 2, 2012; MiniFrame responded on March 30, 2012; and Microsoft replied on April 13, 2012. (Doc. Nos. 19, 24, 25.) The Court heard oral argument on May 11, 2012.

## II. DISCUSSION

### A. Legal Standard

For a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded allegations contained in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Sherman Act Claims

Section 2 of the Sherman Act states, "Every person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2. The Clayton Act imposes civil liability for violations of the Sherman Act. *See id.* §§ 15, 26. Possession of monopoly power alone, however, does not violate the Sherman Act. Instead, it must be accompanied by anticompetitive conduct. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko LLP*, 540 U.S. 398, 407 (2004).

Accordingly, to state a monopolization claim within the meaning of the antitrust laws, a plaintiff must allege facts supporting an inference of the defendant's (1) possession of monopoly power in the relevant market and (2) exclusionary conduct, or "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Attempted monopolization requires proof "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

MiniFrame asserts two instances of purportedly anticompetitive conduct: Microsoft's inclusion of a single-user requirement in its Windows licenses, and its pricing of MPS. (Compl. ¶¶ 75, 135.) However, for the reasons set forth below, neither instance amounts to exclusionary, predatory, or anticompetitive conduct. MiniFrame's federal law claims are therefore dismissed.

#### 1. Single-User Restriction

The crux of MiniFrame's first alleged instance of anticompetitive conduct is that Microsoft modified its licensing agreements to prohibit multiple users from concurrently

---

competition and tortious interference claims. (*See* Opp'n 31-33.) Accordingly, the Court considers these claims solely with reference to New York precedent.

3

using the same operating system. According to MiniFrame, this modification created an "unlawful barrier to entry for any competition to develop against [Microsoft in] the server operating systems market." (*Id.* ¶ 75.) Underscoring this claim, Plaintiff asserts that Microsoft refused to deal with MiniFrame and its customers "on commercially reasonable and non-discriminatory terms," in an attempt to leverage its monopoly power in the multi-user software market. (*Id.* ¶ 146.) This allegation of anticompetitive conduct is insufficient for two distinct reasons.

a. Microsoft's Intellectual Property Rights

Patent holders possess broad authority to enforce their intellectual property rights without violating the antitrust laws. *See Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 486 F. App'x 186, 190–91 (2d. Cir. 2012) ("[Section] 2 does not obligate [a patent holder] to share its patented platform technology" because a patent grants its holder "the lawful power to exclude others' use."). Accordingly, a patent holder is under no obligation to license its technology to its rivals. *See* 35 U.S.C. § 271(d)(4) ("No patent owner otherwise entitled to relief . . . shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . refused to license or use any rights to the patent."); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir. 1981) (finding that a patentee's refusal to license its technology "is expressly permitted by the patent laws" because "[t]he heart of [the patentee's] legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent"). Similarly, patent holders may freely impose conditions or limitations on the use of their technology. *See Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1338 (Fed. Cir. 2006) ("Conduct falling within the scope of protection includes, *inter alia*, limited use licensing . . . ."); *see also United States v. Gen. Elec. Co.*, 272 U.S. 476, 489 (1926) (A patent holder may license its technology "for any royalty, or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure."). Thus, patent holders, like copyright owners, may within broad limits curb the development of a derivative market by refusing to license their technology or doing so only in a limited manner. *See UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000). Given these expansive rights, courts "will not inquire into [a patent holder's] subjective motivation for exerting [its] statutory rights, even though [its] refusal to sell or license [its] patented invention may have an anticompetitive effect, so long as that anticompetitive effect is not illegally extended beyond the statutory patent grant." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1327-28 (Fed. Cir. 2000); *see also id.* at 1329 ("[I]n the absence of any evidence that the copyrights were obtained by unlawful means or were used to gain monopoly power beyond the statutory copyright granted by Congress," a refusal to deal claim predicated upon copyrighted materials fails as a matter of law.).

There is no dispute that the Windows client and server operating systems are Microsoft's intellectual property. (*See, e.g.*, Compl. ¶¶ 17, 26, 27; Opp'n 3.) As such, Microsoft is free to license – or not license – these products as it sees fit within the bounds of its patents. Accordingly, without facts demonstrating that Microsoft obtained its patents illegally or exceeded the bounds of its patent rights by, for instance, tying the sale of its software to other products, no antitrust claim can lie. MiniFrame asserts only that Microsoft's intellectual property

4

rights, while providing a potentially valid justification for the single-user restriction, are "rebutted" by "Microsoft's broader course of anticompetitive conduct." (Opp'n 6.) Specifically, MiniFrame claims that Microsoft (1) "wrongfully refuse[d] to deal" with its rivals on PC-sharing software and (2) changed its licenses in 2007 to stunt growing competition despite the fact that Microsoft had not previously enforced its intellectual property rights. (Compl. ¶ 146; Opp'n 3.) MiniFrame's arguments fail as a matter of law. First, as discussed, patent holders have no duty to deal with their competitors or permit them access to their technology. *See* 35 U.S.C. § 271(d)(4); *SCM Corp.*, 645 F.2d at 1204. Second, Microsoft's decision to change its licensing agreements in 2007 – as opposed to an earlier date – can hardly be viewed as anticompetitive conduct. MiniFrame states that PC-sharing software was not developed until "2003 or 2004." (Compl. ¶ 36.) Thus, it is perfectly understandable that Microsoft chose to amend its licenses to limit *users* in 2007, when, previously, a limit on *computers* would have similarly protected its rights in a solely server-based world.

At base, Microsoft imposed a limitation on its licensing agreements – an entirely valid exercise of its patent rights – that curtailed the ability of third parties to reproduce its software for multiple users. This is a wholly justifiable business purpose, and courts have consistently recognized rights holders' interests in limiting such distribution. *See, e.g.*, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 941 (2005) (finding file sharing system liable for copyright infringement where it permitted users to reproduce and distribute copyrighted files). Accordingly, the Court concludes that Microsoft was well within its rights to include a single-user restriction in its client operating system license agreements. Because MiniFrame nowhere states facts to support that Microsoft acquired its rights illegally, exceeded the scope of its patents, or even modified its licenses for an impermissible purpose, it fails to state a Sherman Act claim premised on Microsoft's single-user restriction.

b.  No Duty to Deal

Even assuming *arguendo* that intellectual property law provides no defense for Microsoft's actions, MiniFrame's Sherman Act claim concerning the single-user restriction would still fail because Microsoft had no duty to deal with MiniFrame. Generally, a corporation has "no duty to aid competitors." *Trinko*, 540 U.S. at 411; *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 600 (1985). However, in narrow circumstances, a corporation may have a duty to deal with a rival when (1) it previously cooperated with the rival, but later refused to do so, and (2) in so doing, sacrificed short-term profits. *Trinko*, 540 U.S. at 409 (monopolists' duty to deal); *see also Spectrum Sports,* 506 U.S. at 459-58 (attempted monopolists' duty to deal). Thus, with respect to the second element, a plaintiff alleging failure to deal must plead facts demonstrating that the defendant intended to engage in predatory – and not merely competitive – behavior. *Aspen Skiing Co.*, 472 U.S. at 601-03.

Microsoft's amended licensing policies, as pleaded in the Complaint, do not fit within these narrow circumstances. First, the Complaint does not allege prior cooperation between Microsoft and MiniFrame. MiniFrame feebly argues that Microsoft's pre-2007 licensing agreements with its users – some of whom also used SoftXpand – established a prior course of dealing from which Microsoft could not unilaterally depart. (Compl. ¶¶ 37-38.) MiniFrame's argument, however, is wholly

5

unsupported by the law. Courts have explicitly held that a prior course of dealing between an alleged monopolist and its end users is not equivalent to the monopolist's prior cooperation with a rival. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008). Second, the Complaint nowhere states facts averring that Microsoft relinquished short-term profits to adopt the single-user restriction. In fact, the Complaint supports the reverse inference, specifically alleging that Microsoft's server operating systems "generate more revenue and are more profitable for Microsoft than shared PC systems." (Compl. ¶ 76.) MiniFrame's antitrust allegation largely rests on the claim that Microsoft changed its licensing agreements to increase the number of licenses users would have to purchase – an obvious boon to short-term profits. (*Id.*); *see MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004) ("Qwest was not forsaking short-term profits by switching from system pricing to per location pricing, but rather was attempting to increase its short-term profits."). Accordingly, MiniFrame has failed to plead a Sherman Act claim based on the duty to deal with rivals on multi-user software.

2. Predatory Pricing

MiniFrame finally asserts that Microsoft's pricing of its MPS multi-user software was predatory within the meaning of the antitrust laws. (Compl. ¶ 131.) However, this claim too falls short. Predatory pricing occurs when "'a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in.'" *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 266 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.8 (1986)). To establish predatory pricing, a plaintiff must prove: "(1) that the prices complained of are below an appropriate measure of its rival's costs, and (2) that the predatory rival has a dangerous probability of recouping its investment through a below cost pricing scheme." *Id.* (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993)) (internal quotations omitted). Because of the difficulty in distinguishing pro-competitive prices from predatory conduct, courts often approach predatory pricing claims with caution. *See, e.g.*, *AD/SAT v. Associated Press*, 920 F. Supp. 1287 (S.D.N.Y. 1996) ("Under normal circumstances, the lowering of prices stimulates competition. Because the mechanism by which a firm engages in predatory pricing is also lowering prices, a mistaken inference of predatory pricing is extremely costly." (internal quotation marks omitted)).

To sufficiently plead the first element of a predatory pricing claim, a plaintiff must assert more than the mere allegation that the defendant's prices were "below general market levels or the costs of a firm's competitors." *Brooke Grp. Ltd.*, 509 U.S. at 223. Instead, a plaintiff must plead something akin to "what [the defendant's] actual costs were" or, in some situations, "standard industry cost." *See Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC*, 414 F. App'x 334, 336 (2d Cir. 2011); *see also Kelco Disposal, Inc. v. Browning-Ferris Indus.*, 845 F.2d 404, 407 (2d Cir. 1988) (deeming a defendant's average variable cost to be an appropriate measure for predatory pricing claims).

MiniFrame has not pled facts demonstrating that Microsoft licensed MPS below cost. MiniFrame alleges that MPS is bundled with Microsoft server products, and that the bundled price is lower than the previous price charged by Microsoft for its

6

server products alone. (Compl. ¶¶ 116, 131-36.) Accordingly, MiniFrame asserts, Microsoft is necessarily selling MPS below cost. (Pl. Opp'n 18) At most, MiniFrame states facts indicating that Microsoft has discounted some of its software, but MiniFrame alleges no facts suggesting that Microsoft suffered *losses* on its pricing scheme. Accordingly, MiniFrame has failed to provide any indicia supporting a finding that Microsoft's price for licensing MPS was "below an appropriate measure" of its costs. Thus, MiniFrame has not pled facts supporting its predatory pricing claim.

\* \* \*

For the reasons stated above, the Court concludes that MiniFrame has failed to plead facts supporting an inference that Microsoft engaged in predatory or anticompetitive conduct. Accordingly, MiniFrame's Sherman Act claims must be dismissed.

### C.  State Law Claims

Jurisdiction in this case is premised on the federal question presented as well as the diversity of citizenship of the parties. *See* 28 U.S.C. § 1332(a)(2). Thus, though MiniFrame's federal claims have been dismissed, the Court will also analyze the asserted state claims.

### 1.  The Donnelly Act

The Donnelly Act is patterned after the Sherman Act and makes illegal any contract, arrangement, or agreement that unreasonably restrains or interferes with free competition in business. N.Y. Gen. Bus. Law § 340; *Anheuser-Busch, Inc. v. Abrams*, 525 N.Y.S.2d 816, 816 (N.Y. 1988). To state a claim under § 340 of the Donnelly Act, a plaintiff must: "(1) identify the relevant product market, (2) describe the nature and effects of the purported conspiracy, (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question, and (4) show a conspiracy or reciprocal relationship between two or more entities." *Yankees Entm't & Sports Network v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 678 (S.D.N.Y. 2002) (citing *Great Atl. & Pac. Tea Co., Inc. v. Town of E. Hampton*, 997 F. Supp. 340, 352 (E.D.N.Y. 1998)). Conclusory allegations of conspiracy are legally insufficient to make out a violation of the Donnelly Act. *Id.* (citing *Sands v. Ticketmaster-N.Y., Inc.*, 616 N.Y.S.2d 362, 364 (N.Y. App. Div. 1994)). In addition, to establish standing to bring an antitrust suit, a plaintiff must demonstrate that it has sustained "an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005) (internal quotations omitted).

The Complaint alleges only unilateral monopolization and attempted monopolization claims and, therefore, MiniFrame's claim fails to plead the fourth element required by the Donnelly Act. *See, e.g.*, *State of New York v. Mobil Oil Corp.*, 381 N.Y.S.2d 426, 426 (1976) (finding "systematic and deliberate" unilateral price discrimination was not a conspiracy under the Donnelly Act). MiniFrame vainly argues that Microsoft "coerced cooperation" from customers, such as equipment manufacturers and end users, who were "forced" by Microsoft to not use SoftXpand. (Pl. Opp'n 29-30.) However, MiniFrame cannot by sleight of hand transform a unilaterally imposed licensing amendment into a cooperative conspiracy. Accordingly, MiniFrame has failed to plead facts supporting the existence of a conspiracy. In addition, for the reasons

7

stated above, MiniFrame has failed to plead facts demonstrating anticompetitive conduct in satisfaction of the Donnelly Act's third element. *Anheuser-Busch, Inc.*, 525 N.Y.S.2d at 820 ("[T]he Donnelly Act – often called a 'Little Sherman Act' – should generally be construed in light of [f]ederal precedent and given a different interpretation only where [s]tate policy, differences in the statutory language[,] or the legislative history justify such a result."). Thus, MiniFrame's Donnelly Act claim is dismissed.

### 2. Washington Antitrust and Unfair Competition Laws

MiniFrame also brings claims under Washington's antitrust and unfair competition laws, which are construed in light of federal precedent. *See Rowan Nw. Decorators, Inc. v. Wash. State Convention & Trade Ctr.*, 898 P.2d 310, 314 n.14 (Wash. 1995). For reasons already discussed and others set forth below, MiniFrame's Washington state claims must be dismissed.

#### a. Section 19.86.040

Section 19.86.040 makes it "unlawful for any person to monopolize, or attempt to monopolize or combine or conspire with any other persons to monopolize any part of trade or commerce." Wash. Rev. Code § 19.86.040. Washington's prohibition on monopolies is "patterned after and contains nearly identical language to the federal Sherman Antitrust Act." *Rowan Nw. Decorators, Inc.*, 898 P.2d at 314. As such, application of Washington antitrust law is "guided by the interpretation given by the federal courts to the corresponding federal statutes." *Id.*; *see also Ceiling & Interior Sys. Supply, Inc. v. USG Interiors, Inc.*, 878 F. Supp. 1389, 1393 n.2 (W.D. Wash. 1993) (Section 19.86.040 "essentially follows [S]ection 2 of the Sherman Act.").

Moreover, the elements necessary to plead a claim for monopolization or attempted monopolization under Washington law mirror those under the Sherman Act. *See, e.g.*, *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665, 679 (Wash. 1987); *Morgan v. Microsoft Corp.*, 107 Wash. App. 1001 (2001). Thus, MiniFrame has failed to state a claim under section 19.86.040 for the same reasons it failed to state a federal antitrust claim.

#### b. Section 19.86.020

Section 19.86.020 makes illegal "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. On its face, "the act demands no more than that a litigant sustain injury as a result of unfair or deceptive acts or practices in the conduct of any trade or commerce." *Anhold v. Daniels*, 614 P.2d 184, 187 (Wash. 1980). However, the Washington Supreme Court has established a public interest requirement as a prerequisite to bringing a private action under this section. *Lightfoot v. MacDonald*, 544 P.2d 88, 90 (Wash. 1976). Thus, to plead a claim under this section, a plaintiff must allege: (1) an unfair or deceptive act or practice; (2) occurring in the conduct of trade or commerce; (3) an impact upon the public interest; (4) an injury to the plaintiff's business or property; and (5) causation. *Alliance Shippers, Inc. v. Always Trans., Inc.*, No. 09 Civ. 3126 (RMP), 2011 WL 4352310, at *4 (E.D. Wash. Sept. 16, 2011). The public interest requirement may be satisfied by showing that "an act or practice which has a capacity to deceive a substantial portion of the public . . . has occurred in the conduct of any trade or commerce," or by establishing the occurrence of a "per se unfair trade practice," as proscribed by statute. *Hangman Ridge Training Stables,*

*Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 535 (Wash. 1986).

MiniFrame has not sufficiently alleged that Microsoft deceived the public or violated a Washington statute. Clearly, Microsoft did not mislead the public by narrowing its licensing agreement from a single-computer to a single-user restriction – the terms of its licensing agreement are explicit. Moreover, it is simply implausible that the public expected Microsoft could not, or indeed would not, change its licensing terms in light of new technology or practices. Finally, while price predation within the meaning of federal law violates section 19.86.020, MiniFrame has not stated facts supporting an inference that Microsoft engaged in such conduct. *See supra* Section II.B.2. Accordingly, this claim also fails, and both of MiniFrame's Washington state law claims are dismissed.

### 3. Unfair Competition

Under New York law, the gravamen of an unfair competition claim is the bad faith misappropriation of a competitor's commercial advantage. *See Major League Baseball Prop., Inc. v. Opening Day Prod., Inc.*, 385 F. Supp. 2d 256, 268 (S.D.N.Y. 2005); *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 682 N.Y.S.2d 505, 506-07 (N.Y. App. Div. 1998). MiniFrame baldly asserts that, "[o]n information and belief, Microsoft copied the functionality and underlying technology of MiniFrame's SoftXpand product, or otherwise obtained such functionality and underlying technology, to create the Windows MultiPoint Server." (Compl. ¶ 108.) However, the Complaint does not allege a single fact in support of the assertion that Microsoft misappropriated MiniFrame's multi-user technology. Moreover, the Complaint itself allows that Microsoft may have "otherwise obtained" the necessary technology. (*Id.*) Accordingly, MiniFrame has not stated a claim for unfair competition under New York law.

### 4. Tortious Interference

To prevail on a claim of tortious interference with business relations, a plaintiff must demonstrate that (1) it had business relations with a third party, (2) the defendant interfered with those relations, (3) the defendant, in doing so, acted for a wrongful purpose or used dishonest, unfair, or improper means, and (4) the defendant's acts injured the relationship. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). The third element – the wrongful means requirement – is demanding in this context because "a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the competing interest of the interferer as well as the broader policy of fostering healthy competition." *Id.* (citing *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 641 N.YS.2d 581, 586 (N.Y. 1996); *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 428 N.Y.S.2d 628, 632-33 (1980)). To qualify as a wrongful means, a defendant's act must (1) be an independent crime or tort, (2) result solely from malice, or (3) amount to "extreme and unfair" economic pressure. *Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 169-70 (S.D.N.Y. 2008), *aff'd*, 321 F. App'x 58 (2d Cir. 2009) (citing *Carvel Corp. v. Noonan*, 785 N.Y.S.2d 359, 361-64 (N.Y. 2004)).

MiniFrame alleges that Microsoft interfered with its business relationships with a number of SoftXpand clients due to its single-user restriction and pricing of MPS. (*See, e.g.*, Compl. ¶¶ 148-65.) However, MiniFrame's allegations plainly fail to satisfy the wrongful means requirement. First, Microsoft's actions were

9

within the bounds of the law, and MiniFrame pleads no facts to support a malicious motive. Second, it is apparent that even a broad view of "extreme and unfair" economic pressure would not encompass Microsoft's behavior. As discussed above, Microsoft is empowered to license and distribute its intellectual property as it sees fit, within the bounds of its patents, even to MiniFrame's current or potential customers. Accordingly, MiniFrame's tortious inference claim is dismissed.

### III. CONCLUSION

For the reasons set forth above, the Court finds that MiniFrame has failed to state a claim against Microsoft under either federal or state law. Accordingly, Microsoft's motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 19 and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 28, 2013
      New York, New York

\*   \*   \*

MiniFrame is represented by Robert Morris and Timothy Helwick of Kramer Levin Naftalis & Frankel, LLP, 1177 Avenue of the Americas, New York, New York 10036.

Microsoft is represented by Richard S. Goldstein of Orrick, Herrington & Sutcliffe LLP, 51 West 52nd Street, New York, New York 10019; Robert A. Rosenfeld and Howard M. Ullman of Orrick, Herrington & Sutcliffe LLP, 405 Howard Street, San Francisco, California 94105; and David F. Smutny of Orrick, Herrington & Sutcliffe LLP, 1152 15th Street, NW, Washington, DC 20005.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-28-13